No. 92,362

STATE OF KANSAS, *Appellee,* v. GEORGE E. ANTHONY, *Appellant.*

145 P.3d 1

Opinion filed October 27, 2006.

*Shawn E. Minihan,* of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Robert D. Hecht,* district attorney, argued the cause, and *Amy M. Memmer,* assistant district attorney, and *Phill Kline,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: Defendant George E. Anthony appeals his jury trial conviction on one count of first-degree premeditated murder. He raises six issues for our consideration: (1) Was his testimony improperly impeached with his post-arrest silence? (2) Is he entitled

to reversal of his conviction because of prosecutorial misconduct? (3) Should the videotape of his interrogation shown to the jury have been redacted to remove a detective's comments on his veracity? (4) Should the district court judge have given a limiting instruction regarding evidence of other wrongs? (5) Should the district court judge have given an *Allen*-type instruction? and (6) Does cumulative error require reversal?

Anthony's conviction followed his third trial for the murder of David Carrington, Anthony's off-and-on landlord and employer. The first two trials resulted in hung juries on the first-degree murder charge. In the second trial, Anthony was acquitted on charges of aggravated burglary and theft.

Carrington's wife, Yelena, discovered her husband's body on the ground outside their house at 9:30 a.m. on October 9, 2002. At some point, she also realized that she was missing $60 to $80 in $20 bills from her purse, which she kept inside the open back door of the house.

Paramedics responding to Yelena Carrington's 911 call initially believed that Carrington had suffered a heart attack and fallen. However, coroner Erik Mitchell, M.D., concluded that Carrington's injuries were not consistent with that scenario; rather, Carrington died from extensive damage to his skull and brain from multiple blows to his head and neck.

Once Carrington's death was determined to be suspicious, crime scene investigators gathered physical evidence from the scene, including fingerprints, hair, samples of blood spatter, shoe imprints from the Carringtons' kicked-in gate, and fingernail scrapings from Carrington. Despite DNA testing and other analysis, none of this physical evidence implicated Anthony.

Yelena Carrington gave law enforcement officers Anthony's name, among others, saying that he was one of several people who had a "beef" with her husband. Anthony had been evicted more than once from one of Carrington's rental properties, where he sometimes did repair work. One of the evictions had happened the previous month, and, this time, Carrington had obtained a restraining order against Anthony to keep him off the properties. Testimony about the existence of the restraining order and a certified

copy of the order were admitted into evidence against Anthony over a relevance objection by defense counsel. Anthony was unaware of the restraining order until after Carrington was killed. A police detective also testified that he was aware of a threat Anthony had made about Carrington.

Once police had Anthony's name, Detective Don Kennedy went to the house at which Anthony and his girlfriend, Stephanie Brown, had been staying and left his card. Anthony called Kennedy on October 11 and set up an appointment, which Anthony did not keep. On October 14, Kennedy discovered Anthony and Brown sleeping in a car, and they agreed to come to the police station to talk.

At the station, Kennedy informed Anthony of his rights and questioned him for 35 minutes, during which time Anthony said that he was asleep with Brown on the morning Carrington was killed, that he had not gone to the Carringtons' house, and that he had not spoken with Carrington.

Kennedy then interviewed Brown. She said Anthony had told her on the night of October 8 that he needed to get up early the next morning to do something. When an alarm clock Anthony had set went off at 5 a.m. the morning of Carrington's death, Anthony got up and told Brown he had to go to work. She asked him not to go, and he said they needed money. When she asked if she could go with him, he said no and said he "didn't need any witnesses." Anthony returned about 6:35 a.m. and told her not to tell anyone he had left the house. When he returned, he had a new pack of cigarettes and three $20 bills, one of which he gave to Brown.

After interviewing Brown, Kennedy returned to renew his questioning of Anthony. Approximately 2 hours had passed. After another officer took photographs of Anthony's hands and took some items of his clothing, Kennedy told Anthony that he knew Anthony had killed Carrington, that there was enough evidence to prove Anthony did it, and that all he wanted to know was why. Anthony said he did not kill Carrington.

Kennedy persisted, and Anthony admitted he had gone to the Carrington home the morning of the crime. He said that he merely talked to Carrington about their differences; about the eviction;

about Anthony's disability, a missing eye; and about how badly Carrington had treated him. Anthony maintained that he argued with Carrington but that Carrington had been alive when he left.

Kennedy stated again that he had the evidence to prove Anthony killed Carrington, and that he just wanted to know why. Anthony finally said: "I don't know. I don't know. I'm not sure. It wasn't intentional. I guess that's it," and then, "After all the years of bullshit I couldn't take it no more." The detective then asked Anthony to start at the beginning and recount the story, and Anthony asked for a lawyer and ended the interview.

Kennedy testified that his tactic in interviewing Anthony was to make him believe police already knew Anthony had committed the murder and just wanted an explanation. When the jury watched the videotape of Anthony's interrogation, a passage in which Kennedy referenced Anthony's past drug usage was muted. A limiting instruction was given about the muted passage. The defense did not object to the admission or the viewing of the videotape.

The Carringtons' neighbor, Dave Stevens, testified that, at about 5:50 a.m. on the morning of Carrington's murder, someone was walking in the neighborhood when he and his wife were out walking. He testified the person was a 6'2" black male, about 20 years old. Stevens also said the person was holding a long object like a baton. Anthony is a black male, 6'8" tall. He was 48 years old at the time of Carrington's murder.

Anthony introduced evidence that the police received a call from another witness who saw a man carrying a golf club in the area on the morning Carrington was killed. The man was described as a white male, 5'10" to 6' tall.

### Impeachment with Post-arrest Silence

Anthony's first argument on appeal is that the prosecutor used testimony from Kennedy that Anthony had ended the interview, as well as the videotape of the interrogation in which Anthony invoked his right to counsel, to impeach Anthony with his post-arrest silence in violation of *Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976), the Fifth Amendment to the United

States Constitution, and § 10 of the Kansas Constitution Bill of Rights.

The State argues that this issue was not preserved through appropriate objections at trial. If this court reaches the merits of the issue, the State asserts that this case is distinct from *Doyle* and no error occurred.

A party must make a timely and specific objection to the admission of evidence at trial in order to preserve the issue for appeal. *State v. Diggs*, 272 Kan. 349, 365, 34 P.3d 63 (2001). Issues not raised before the trial court may not be raised on appeal. *State v. Williams*, 275 Kan. 284, 288, 64 P.3d 353 (2003).

However, there are several exceptions to the general rule that a new legal theory may not be asserted for the first time on appeal, including the following: (1) the newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) consideration of the theory is necessary to serve the ends of justice or to prevent denial of fundamental rights; and (3) the judgment of the trial court may be upheld on appeal despite its reliance on the wrong ground. *State v. Schroeder*, 279 Kan. 104, 116, 105 P.3d 1237 (2005).

It is not clear from the record on appeal that the jury actually saw that portion of the videotape in which Anthony invoked his right to counsel. However, it is clear that members of the jury heard Kennedy testify that Anthony chose to discontinue the interview after his admissions and Kennedy's ensuing request that Anthony recite his story from the beginning. Kennedy's response to the prosecutor's question on this point was interrupted momentarily by defense counsel's request to approach the bench, but Anthony's lawyer withdrew the request immediately, without lodging an objection.

Regardless, we reject Anthony's position on this issue. The State is correct that the argument was not preserved, but it also fails on the merits. This is not a case, as in *Doyle*, where a defendant was silent when first contacted by law enforcement officers. See *Doyle*, 426 U.S. at 619. Anthony was not silent. When interrogated, he confessed. He never invoked his right to silence. And he invoked his right to counsel only after the cat was out of the bag. Under

these circumstances, we see no *Doyle* violation and no federal or state constitutional problem.

## Prosecutorial Misconduct

Anthony argues that the prosecutor "committed repeated misconduct" in three specific instances, one during opening statement and two during closing argument. We are willing to examine these instances even in the absence of defense objections at trial. See *State v. Dixon*, 279 Kan. 563, 581, 112 P.3d 883 (2005).

*State v. Tosh*, 278 Kan. 83, 91 P.3d 1204 (2004), sets out the two-step appellate analysis of prosecutorial misconduct claims. We ask first whether the complained-of conduct was outside the considerable latitude given a prosecutor in discussing the evidence and, second, whether the remarks constitute plain error, that is, whether the statements prejudiced the defendant and denied him or her a fair trial. *Tosh*, 278 Kan. at 85; see *Dixon*, 279 Kan. at 590-91. The second step requires three factors to be considered: (1) whether the misconduct is gross and flagrant; (2) whether the misconduct shows ill will on the prosecutor's part; and (3) whether the evidence was so overwhelming that the misconduct was likely to have little weight in the minds of jurors. *Tosh*, 278 Kan. at 93; see *Dixon*, 279 Kan at 592. None of these factors is individually controlling. Moreover, the third factor may not override the first two factors unless the harmlessness tests of both K.S.A. 60-261 and *Chapman v. California*, 386 U.S. 18, 22, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967), are met. K.S.A. 60-261 demands that a refusal to grant a new trial be inconsistent with substantial justice before reversal is required. The *Chapman* test for federal constitutional error assumes reversal unless we can conclude beyond a reasonable doubt that an error had little, if any, likelihood of changing the result of the trial. *Tosh*, 278 Kan. 83, Syl. ¶ 2.

We examine each of the instances Anthony challenges with these standards in mind.

### Opening Statement

Anthony asserts the prosecutor mischaracterized evidence during his opening statement and prejudiced the defense by implying

that Anthony's was the only name Yelena Carrington was able to give the police. Specifically, the prosecutor told the jury: "Detective Kennedy asked [Yelena Carrington] is there anyone that Mr. Carrington had been having problems with. Mrs. Carrington was able to give them one name, George Anthony."

We first note the prosecutor's statements did not necessarily imply that Yelena Carrington gave the police *only* one name. The statements were ambiguous. They could have meant that she gave Kennedy Anthony's name, among others; they could have meant that she gave Kennedy only Anthony's name.

Further, to the extent there was ambiguity, Yelena Carrington's testimony clarified it. When questioned at trial, she said that she gave Kennedy two or three names, including Anthony's.

Under these circumstances, even if the prosecutor's remarks during opening statement could be classified as "outside the wide latitude" afforded the State's attorney in discussing the evidence, in isolation, they are not gross and flagrant, do not reflect ill will on the prosecutor's part, and would have been harmless under both K.S.A. 60-261 and *Chapman*.

<u>Discussion of Premeditation</u>

Anthony next asserts that the prosecutor committed reversible misconduct by misstating the law of premeditation during closing argument. The transcript passage in issue reads:

"We're talking about early in the morning. Whoever did this went to this man's home. They either brought a weapon with them, or picked one up there at the scene, attacked this man while he was outside, either while he was in his backyard, or chased him into his backyard to deliver at least seven blows. And if you think about it, the two blows that actually killed David Carrington had to occur at some point, they may have occurred last and David Carrington went to the ground, but if they came last, then there is at least five blows before them. This person is thinking about what they are doing. They know what they are doing. If those two blows came first, then David Carrington is unconscious, defenseless on the ground, and this person continues to beat him at least five more times. That's premeditation."

It is unclear exactly what Anthony finds objectionable about the prosecutor's discussion of the evidence here. In his brief, Anthony poses several questions: "Where does the prosecutor find the evi-

dence that there were five other blows, besides the two blows to the head? Where does the prosecutor find evidence that Mr. Carrington was chased into the back yard? How does the prosecutor infer that the two blows came first?"

We see plenty of evidence to support the prosecutor's remarks. See *State v. Doyle*, 272 Kan. 1157, 1164, 38 P.3d 650 (2002) (prosecution given wide latitude in language, manner, presentation of closing argument as long as remarks consistent with evidence adduced). There were multiple blows to Carrington's head and neck, two of which cracked his skull and damaged his brain, causing death. The coroner also pointed out at least seven distinct injuries. Although it was unclear exactly how the crime occurred, that is, whether Carrington was already in his back yard or was chased there, and in what order the blows fell, the prosecutor merely posited one or two of the scenarios consistent with the evidence. This was well within the boundaries set by our previous rulings on this subject.

We also see no error in the prosecutor's reference to premeditation. This court has held that premeditation is adequately defined in PIK Crim. 3d 56.04(b), as "to have thought over the matter beforehand." See *State v. Morton*, 277 Kan. 575, 584, 86 P.3d 535 (2004). That instruction was given in this case.

The prosecutor's remarks here—essentially pointing out that the number and order of blows could have given the perpetrator an opportunity to think about what he or she was doing and that infliction of additional blows after the first blows had rendered Carrington helpless could constitute premeditation—were consistent with the PIK instruction and our precedent. See, *e.g.*, *State v. Pabst*, 273 Kan. 658, 661, 44 P.3d 1230, *cert. denied* 537 U.S. 959 (2002) (no error for prosecutor to say premeditation "means to have thought the matter over beforehand. It's the conscious act of a person"); but see *Morton*, 277 Kan. at 578 (prosecutor gestured as though firing a gun, stating: "That can be premeditation under the laws of the State of Kansas. One squeeze of a trigger is all it takes"; implication premeditation can be instantaneous was reversible misconduct); *State v. Holmes*, 272 Kan. 491, 497, 499-500, 33 P.3d 856 (2001) (reversible error for prosecutor to say "pre-

meditation can occur in an instant. That's the law in the State of Kansas"). This is not a case in which the prosecutor improperly suggested that premeditation can be instantaneous or formed during the commission of the act. See *Doyle*, 272 Kan. at 1163 (error for prosecutor to say: "Something can be premeditated as soon as it happens."). And we have specifically held that the dealing of additional blows after a victim has been felled and rendered helpless can indicate premeditation. See *State v. Scott*, 271 Kan. 103, 108-109, 21 P.3d 516, *cert. denied* 534 U.S. 1047 (2001).

## References to Defendant's Lie During Interrogation and to "The Wizard of Oz"

Anthony's final argument on prosecutorial misconduct focuses first on the prosecutor's remarks regarding the three inconsistent stories Anthony gave to the police: an alibi; an admission that he saw and argued with Carrington on the morning of the crime but did him no harm; and, finally, his confession. When discussing the inconsistent stories, the prosecutor said: "[Y]ou have to ask yourself why would he lie about his whereabouts the morning David Carrington was killed."

In summation, a prosecutor may not introduce or comment on facts outside the evidence. *State v. Finley*, 273 Kan. 237, 244, 42 P.3d 723, (2002). And, generally speaking, the prosecutor's personal opinion regarding the defendant's credibility is improper fodder for closing argument. We have held gross and flagrant misconduct exists when a prosecutor repeatedly and deliberately makes such comments. See, *e.g., State v. Elnicki*, 279 Kan. 47, 65-68, 105 P.3d 1222 (2005); *State v. Pabst*, 268 Kan. 501, 505-07, 996 P.2d 321 (2000). However, reasonable inferences may be drawn from the evidence and, as discussed above, considerable latitude is allowed a prosecutor in discussing it. *Finley*, 273 Kan. at 244. In this instance, the prosecutor was not giving a personal opinion on Anthony's credibility; he was merely commenting on the evidence of Anthony's conflicting stories. See *Finley*, 273 Kan. at 246. This comment on the evidence was permissible. See *State v. Moore*, 274 Kan. 639, 645-47, 55 P.3d 903 (2002).

Anthony also challenges the portion of the prosecutor's closing argument drawing an unflattering analogy between the defense position and a famous scene from the film version of "The Wizard of Oz." Defense counsel, in his closing argument, had urged the jury to question the thoroughness of the investigation done by the police, including failure to follow up on other suspects. He particularly asked the jury to focus on the lack of direct or physical evidence against Anthony. In rebuttal, the prosecutor then said:

"[Prosecutor]: . . . . Have you ever seen the 'Wizard of Oz?'

"[Defense Attorney]: Judge, I am going to object to that. That is a characterization about me being Oz, I object."

"The Court: Overruled.

"[Defense Attorney]: He can't do that.

"The Court: Overruled.

"[Prosecutor]: When Dorothy, the tin man, the scarecrow and the lion are there finally in the Emerald City going before the great Oz, there is this giant head floating in the air with all the colored smoke and flashing lights. And they're all standing there shivering out of fear from the great Oz, except for Toto. Toto sees the curtain off to the side, and he runs over there and he pulls back the curtain, and you will see a man, I can't remember his name now, working all the controls and talking into the microphone. And suddenly you hear the great Oz say pay no attention to that man behind the curtain. Because if they do pay attention to that man behind the curtain, they see the truth. There is no great Oz, there is just the man behind a curtain.

"This is the man behind the curtain. This is what they don't want you to pay attention to. Because if you do, then you see the truth. And you can't take things and take the testimony then to try to force it to be something else. You can only present it to what it is.

. . . .

"I'm going to ask you to be Toto, expose the man behind the curtain. Expose George Anthony. Because if you pay attention to what's going on over here like Dorothy and the boys, you don't see the truth. But when you expose the man behind the curtain, you do. Expose George Anthony, see the truth. The truth only came from one source, and that was directly out of his own mouth."

Anthony asserts that this analogy and the district judge's reaction to it prejudiced him in three ways: First, the analogy demeaned his defense attorney by likening him to the Wizard of Oz, who turned out to be a "fake and a liar." Second, the analogy "[led] the jury to believe that . . . the [defense] attorney [was] making things up because he [was] the Wizard of Oz," "inappropriately

casts doubt on the defendant's defense," and "shows per se ill will." Third, when the district judge overruled defense counsel's objection, the court "clearly sent a message to the jury that they could consider the prosecutor's opinion that [the defense attorney] was a fake and a liar."

We agree with the State that this argument lacks merit. We have previously approved a prosecutor's colorful language comparing the defendant to a magician creating a "big puff of smoke" to divert the jury's attention from persuasive evidence. See *State v. Rodriguez*, 269 Kan. 633, 642-44, 8 P.3d 712 (2000); see also *State v. Duke*, 256 Kan. 703, 718, 887 P.2d 110 (1994). The analogy here was comparable. In addition, the analogy was responsive to the defense argument regarding the thoroughness of the investigation of this crime. See *State v. McKinney*, 272 Kan. 331, 347, 33 P.3d 234 (2004) (responsive argument permitted).

## Summary

Having fully reviewed Anthony's various criticisms of the prosecutor's performance in this case, we see only one potential error: the reference during opening statement to Anthony's name being given to police. As stated above, that reference, if it does constitute error, does not by itself require reversal. No further analysis under the factors enumerated in *Tosh* is required.

### Redaction of Videotape of Interrogation

Anthony argues on appeal that the videotape of his interrogation, which was played for the jury at trial without objection, should have been redacted to remove repeated comments by the detective regarding Anthony's lack of credibility or veracity. On the videotape, the detective, although unfailingly polite, pretends to knowledge about the crime he does not have and repeatedly tells Anthony that he is not being truthful.

We agree with the State that the absence of an objection before the district court means this evidentiary issue was not preserved for appeal, and we therefore decline to reach it on the merits. The decision on which Anthony seeks to rely, *Elnicki*, 279 Kan. at 53, involved a defendant whose counsel objected to showing the jury

an unredacted videotape of an interrogation. And the requirement of an objection is consistent with the facts of the nine cases that underlay the *Elnicki* decision. See *State v. Plaskett*, 271 Kan. 995, 1009, 27 P.3d 890 (2001) (trial court erred in allowing detective to express opinion whether child victim was telling the truth); *State v. Manning*, 270 Kan. 674, 698, 19 P.3d 84 (2001) (questions compelling defendant or witness to comment on credibility of another witness improper); *State v. Mullins*, 267 Kan. 84, 97, 977 P.2d 931 (1999) (line of inquiry equivalent to asking one witness if another witness was telling the truth improper, error in allowing answer); *State v. Steadman*, 253 Kan. 297, 304, 855 P.2d 919 (1993) (admission of witnesses' testimony that in their opinion the defendant was guilty deprived defendant of fair trial); *State v. Jackson*, 239 Kan. 463, 470, 721 P.2d 232 (1986) (error for trial court to permit witnesses to testify and tell jury that, in their opinions, defendant committed the charged acts) *State v. Lash*, 237 Kan. 384, 386, 699 P.2d 49 (1985) (question which called for expert to express opinion about witnesses' credibility improper). The lone case in which an objection was lacking involved a challenge to two portions of an expert's testimony on the credibility of a child's account of sexual molestation. The court reversed on one portion, which was accompanied by an objection, but refused to consider the other because the defendant had failed to object to it. See *State v. Arrington*, 251 Kan. 747, 840 P.2d 477 (1992).

Without an objection, as here, an appellate court cannot assume that the playing of an unredacted interrogation videotape is something the defense wants to avoid. In fact, in many criminal cases, having lost a motion to suppress a confession, the defense may want such a tape played without redactions to demonstrate what it argues is overreaching or unfair trickery by law enforcement. In this particular case, when the jury asked to see the tape again during its deliberations, Anthony said, "Let it play, let them hear what I said."

We do not regard an *Elnicki* issue as one we must address to serve the ends of justice or prevent a denial of fundamental rights. See *Williams*, 275 Kan. at 288-89. Instead, we adhere to our general rule that a challenge to the admissibility of evidence will not

be considered for the first time on appeal. See *State v. Kunellis*, 276 Kan. 461, 477, 78 P.3d 776 (2003).

### *Failure to Give a Limiting Instruction on Other Crimes or Civil Wrongs*

Anthony next argues the district court erred in failing to give a limiting instruction regarding evidence admitted on the recent eviction, the restraining order, and the threat against Carrington.

The district court allowed testimony about the eviction and the restraining order and admission of a copy of the restraining order on the ground that they tended to show deterioration in the relationship between Anthony and Carrington. At the time of Anthony's third trial, evidence was admissible independent of K.S.A. 60-455 for this purpose and did not require a limiting instruction. See, *e.g.*, *State v. Deal*, 271 Kan. 483, 502, 23 P.3d 840 (2001); *State v. Carr*, 265 Kan. 608, 624, 963 P.2d 421 (1998). In *State v. Gunby*, 282 Kan. 39, 144 P.3d 647 (2006), we rejected the relationship of the parties as an independent basis for admission of what would otherwise be K.S.A. 60-455 evidence requiring a limiting instruction.

If the evidence about Anthony's eviction and the restraining order truly were evidence of another crime or civil wrong committed by Anthony, *Gunby* would require us to rule that the absence of the limiting instruction needed with admission of K.S.A. 60-455 evidence was error in this case. But we do not believe either the eviction or the restraining order qualify as evidence of other crimes or civil wrongs committed by Anthony. Neither, as introduced in Anthony's third trial, involved a violation of a criminal statute. And although they were effected through civil court procedures, the "wrongs" giving rise to them, if any, were not the types of behavior that would demonstrate propensity to commit the crime at issue. In short, the admission of this evidence offended neither the statute nor the policy behind it. Thus K.S.A. 60-455 did not apply, and the district judge was free to admit the evidence without a limiting instruction.

Anthony also challenges the district court's admission of evidence regarding a threat he made against Carrington without a

limiting instruction. At Anthony's first trial, the State offered testimony from a witness who said that Anthony used the witness' phone to call Carrington after the eviction and that Anthony said he would "get even." This witness did not testify in the third trial underlying this appeal, however, and the State never attempted to introduce evidence of the threat.

To the extent the threat was mentioned, it came up during defense counsel's cross-examination of Kennedy about his reasons for focusing on Anthony as a suspect. Anthony's lawyer inquired whether, in addition to the eviction and the restraining order, the detective had information about Anthony making threats against Carrington. Kennedy responded in the affirmative. Rather than abandon the point, defense counsel pressed it, mentioning the name of the earlier witness and describing the threat about which the witness had testified in the first trial. To the extent the admission of this evidence without a limiting instruction could be considered error, it would constitute invited error, and Anthony cannot complain about it on appeal. See *State v. Hebert*, 277 Kan. 61, 78, 82 P.3d 470 (2004).

### Allen-*type Instruction*

Anthony argues the district court judge erred in giving an *Allen*-type instruction that "[l]ike all cases, [this case] must be decided sometime." He contends this instruction misled the jury and exerted undue pressure for a verdict. There was no objection to this instruction at trial.

"No party may assign as error the giving or failure to give an instruction . . . unless the party objects thereto before the jury retires to consider its verdict stating distinctly the matter to which the party objects and the grounds of the objection unless the instruction . . . is clearly erroneous." K.S.A. 2005 Supp. 22-3414(3); see also *State v. Bell*, 280 Kan. 358, 364, 121 P.3d 972 (2005). Instructions are clearly erroneous only if the reviewing court is firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred. 280 Kan. at 364.

PIK Crim. 3d 68.12 contains the wording challenged in this case. The use of PIK instructions, while not mandatory, is strongly recommended. The pattern instructions have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions. See *Hebert*, 277 Kan. at 87.

Anthony is correct that this instruction has been the source of some controversy. We have disapproved of its use when given after deliberations have begun. See, *e.g.*, *State v. Struzik*, 269 Kan. 95, Syl. ¶ 6, 5 P.3d 502 (2000); *State v. Boyd*, 206 Kan. 597, 600-01, 481 P.2d 1015 (1971), *cert. denied* 405 U.S. 927 (1972); *Bush v. State*, 203 Kan. 494, 498-99, 454 P.2d 429 (1969). However, even those situations have rarely resulted in reversals. See, *e.g.*, *State v. Troy*, 215 Kan. 369, 373, 524 P.2d 1121 (1974).

On the other hand, when, as here, the instruction accompanies all of the rest of the instructions given before deliberations begin, there is no error. See *State v. Makthepharak*, 276 Kan. 563, 569, 78 P.3d 412 (2003); *State v. Roadenbaugh*, 234 Kan. 474, 483, 673 P.2d 1166 (1983); *State v. Irving*, 231 Kan. 258, 265-66, 644 P.2d 389 (1982).

We will not depart from that holding in this case. Even if it is not literally inevitable that "all cases . . . must be decided sometime," inclusion of the quoted language in this instruction does not render it clearly erroneous. If the instructions properly and fairly state the law as applied to the facts of the case, and a jury could not reasonably have been misled by them, the instructions do not constitute reversible error even if they are in some way erroneous. *State v. Mays*, 277 Kan. 359, 378-79, 85 P.3d 1208 (2004).

### Cumulative Error

The last issue on this appeal is cumulative error. Cumulative trial errors, considered collectively, may be so great as to require reversal of a defendant's conviction. The test is whether the totality of the circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found under the cumulative effect rule if the evidence is overwhelming against a defendant. *Plaskett*, 271 Kan. at 1022.

Although the weight of the evidence against Anthony may not be subject to characterization as overwhelming, we see only one potential error among those alleged in this appeal—the prosecutor's remarks in opening statement. One error cannot support reversal under the cumulative effect rule.

The judgment of the district court is affirmed.