NOT DESIGNATED FOR PUBLICATION

No. 119,447

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MARK ALAN BURGHART,
*Appellant*.

MEMORANDUM OPINION

Appeal from Pottawatomie District Court; JEFFREY R. ELDER, judge. Opinion filed October 25, 2019. Affirmed.

*James M. Latta*, of Kansas Appellate Defender Office, for appellant.

*Steven J. Obermeier*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before BRUNS, P.J., LEBEN, J., and BURGESS, S.J.

PER CURIAM:  Mark Alan Burghart was convicted by a jury of theft and aggravated burglary at a home outside of Manhattan, Kansas. On appeal, Burghart argues that the district court erred in denying his motion to suppress and claims the State committed error during closing arguments. We affirm.

1

FACTUAL AND PROCEDURAL BACKGROUND

Sometime between 3:30 a.m. and 4:30 a.m. on June 24, 2016, someone broke into Julie Woodman's home in Manhattan, Kansas. Around this time, Woodman was awake in her office while her husband and granddaughter were sleeping. While in her office, Woodman heard footsteps and a loud noise. Woodman opened the door and called out her husband's name, believing the footsteps belonged to him.

After Woodman opened the door and called for her husband, she heard the footsteps quicken and hurry through the house. Woodman followed the sound and walked to the mud room and saw that the door to the exterior of the house had been shut and bounced back open. Realizing it was not her husband, Woodman ran into the bedroom where he was sleeping and they called the police. Woodman never saw who broke in and did not have any idea who it could have been.

Woodman discovered various items missing from her house, including her purse and a pillbox. Woodman also noticed two bottles of water in her yard and two puddles of water in and near her home, none of which were present the evening before.

Pottawatomie County Sheriff's Deputy Justin McNutt and Deputy Andrew Blake Hinkle were dispatched to Woodman's home. Woodman's home is a large, single-family residence in a rural area. Deputies McNutt and Hinkle searched the area around Woodman's home and secured the scene. They were unable to find the intruder. Deputy McNutt located multiple shoeprints inside and outside the home that did not belong to the Woodmans.

At roughly 5:15 a.m., Deputy Hinkle searched the surrounding area in his patrol car. Deputy Hinkle testified he was "about a 16th of a mile from the Woodman residence" when he saw an individual, later identified as Burghart, jogging down the

2

street. Deputy Hinkle stopped and questioned Burghart about the break in. Burghart gave the officer what was later determined to be a false name and false birthdate. Burghart also told Deputy Hinkle that 20 minutes earlier he had seen two people running to "the higher campground area" and that they were wearing dark clothes. Deputy Hinkle talked to Burghart for three to five minutes.

Deputy Hinkle went to the campground where Burghart claimed he saw two people running and saw Burghart again. Because the personal information Burghart gave Deputy Hinkle was not returning anything from dispatch, Deputy Hinkle talked to Burghart again. Burghart then told Deputy Hinkle he was from Montana but lived in Manhattan. Deputy Hinkle proceeded to search the campground but did not find any evidence.

Deputy Alex Kinderknecht assisted in processing the crime scene at the Woodmans' residence. Deputy Kinderknecht investigated shoeprints discovered at the Woodmans' house. At trial, Deputy Kinderknecht testified that he compared a picture of the footprint discovered at the Woodmans' house to pictures of Burghart's shoes worn on the day in question. The officer testified that the shoe prints showed a resemblance.

Around the same time Woodman reported the intruder, Woodman's neighbor, Julie Martin, thought she heard someone on her property; however, she did not investigate the noises. Martin left her property a little later, around 6:30 a.m., to take her son's girlfriend to work. While Martin was away from her home, her friend, Randy Fetters, was on her property assisting with yard labor.

While she was gone, Fetters called Martin and told her that Burghart was on her property inquiring about a van. Martin asked Fetters to tell Burghart to leave. Fetters told Burghart he needed to leave, and Burghart left Martin's property. On her way back home that morning, Martin spoke to Burghart on the phone. Burghart and Martin knew each

3

other. Burghart had been to Martin's home previously, and Burghart had been in contact with Martin's son about purchasing the van. That morning, Burghart told Martin he wanted to "work on the van or to get the van picked up or to get the van moved."

When Martin returned home, she noticed things laying on the ground that did not belong to her, such as pillboxes, a purse, and a wallet. Martin also looked inside the van and saw a backpack on the driver's seat. The backpack was not hers and was not there previously. Martin eventually called the police to report her findings and Fetters left. Fetters testified that he left because a warrant was out for his arrest. Before Fetters left Martin's property, he saw various items around the property, including items that had the name "Woodman" on them.

Sergeant Jason Siversten arrived at Martin's house around 10 a.m. Sergeant Siversten spoke to Martin and took photographs of the scene. Sergeant Siversten also discovered a backpack sitting in the driver's seat of the van. The officer asked Martin if it was her backpack and she said it was not. Sergeant Siversten took the backpack out of the van and placed it in his patrol car. Sergeant Siversten then drove back to the sheriff's office without searching the backpack.

A few hours later, at 12:53 p.m., Martin called Sergeant Siversten at the sheriff's office. Martin advised the officer she thought she had seen Burghart and that he had been texting her. Burghart asked for Martin's son's phone number, asked to come back to her house, and wanted to pick up his backpack. Martin did not respond to any text.

Sergeant Siversten was on his way back to Martin's house when he was notified that other officers were in contact with Burghart. Sergeant Siversten went to Burghart's location which was in the area of Woodman's and Martin's homes. Lieutenant Doug Adams was also called to the location.

4

Sergeant Siversten asked Burghart if he was missing a backpack. Burghart said he was not. Burghart also stated that he was just out walking and he had a passport but had left it at home. Lieutenant Adams asked Burghart more questions about what he was doing, where he lived, and his transportation to the area. Lieutenant Adams asked Burghart about his text messages with Martin, and he said that was the second time he heard Martin's name that day but denied knowing who she was.

After Sergeant Siversten was finished speaking to Burghart, he went back to his patrol car and searched the backpack to try and identify who the owner may be. In it, the officer discovered Burghart's passport, syringes, a digital scale, a tablet, and a pillbox that Woodman had described.

Soon after, Burghart was placed under arrest. Ultimately, the State charged Burghart with theft and aggravated burglary after dropping two counts of possession of drug paraphernalia.

Before trial, Burghart filed a motion to suppress, arguing Sergeant Siversten's warrantless search of his backpack violated his Fourth Amendment rights and no exception applied. A hearing was held on the motion to suppress and Sergeant Siversten was the only witness. The officer testified that he took the backpack out of the van because the van belonged to Martin's son and Martin had advised him that the backpack did not belong to her or her son and that she wanted the officer to take it. Sergeant Siversten testified that he then placed the backpack in his patrol car and secured it but did not search it at that point. Sergeant Siversten also testified that later that day he asked Burghart if he was missing a backpack and Burghart told him no. Sergeant Siversten proceeded to search the backpack to "try and determine who the owner was."

5

On cross-examination, Sergeant Siversten testified that he was aware Burghart had texted Martin before he questioned him if he was missing a backpack, but he had not yet read the texts himself. This exchange followed:

"[Burghart's counsel:] Explain to me then, how [Burghart's denial] disqualifies Mr. Burghart as the owner of the backpack that you possessed at that time?

"[Sergeant Siversten:] Because my interpretation of it is he's not—he does not have a backpack and he's not missing a backpack. He had stated that he wanted to come get a backpack. At that point my determination it's him saying that that's not his backpack."

The district court made findings from the bench at the end of the suppression hearing. The district court denied the motion and stated that Burghart had the burden of establishing he had an expectation of privacy in the property that was searched. The district court then found that Burghart "did not have an expectation of privacy to have standing to object to the search of the van." The district judge added that Burghart had the burden of establishing ownership and "he clearly could have said no, my backpack's in this van over here, or no, I've got a backpack. But he denied missing one. I think that prevents [Burghart] from objecting or having standing to objecting to the search of the backpack."

After the motion was denied, the case proceeded to trial. In addition to the above facts, Jena Sparling, a Kansas Bureau of Investigation forensic scientist, testified that the DNA profile found on water bottles located at the scene matched the DNA profile of Burghart. Additionally, both Martin and Fetters testified that they have been convicted of a crime of dishonesty. Burghardt makes the additional claim on appeal that the State said that Burghart lied multiple times during closing arguments.

6

The jury found Burghart guilty of theft and aggravated burglary. Burghart was sentenced to 49 months in prison for aggravated burglary and a consecutive 12 months in jail for theft.

Burghart timely filed this appeal.

## DID THE DISTRICT COURT ERR WHEN IT DENIED BURGHART'S MOTION TO SUPPRESS?

On appeal, Burghart argues that the officers violated his Fourth Amendment right against warrantless searches and seizures when Sergeant Siversten searched his backpack without a warrant, knowing the backpack belonged to Burghart. He also contends that the district court's error in denying his motion to suppress was not harmless because all remaining evidence was weak.

The standard of review for a district court's decision on a motion to suppress has two components. The appellate court reviews the district court's factual findings to determine whether they are supported by substantial competent evidence. The ultimate legal conclusion, however, is reviewed using a de novo standard. In reviewing the factual findings, the appellate court does not reweigh the evidence or assess the credibility of witnesses. *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018).

In order to have standing to seek suppression of evidence, a defendant in a criminal case must have a legitimate expectation of privacy in the place searched. The defendant bears the burden to prove standing. Once standing is established, the State bears the burden of proving the lawfulness of the search and seizure by a preponderance of the evidence. *State v. Talkington*, 301 Kan. 453, 476, 345 P.3d 258 (2015).

7

The district court found that Burghart failed to meet his burden of proof. When a district court finds that a party failed to meet its burden of proof, a negative finding standard applies. In reviewing a negative factual finding, the appellate court must consider whether the district court arbitrarily disregarded undisputed evidence or relied upon some extrinsic consideration such as bias, passion, or prejudice to reach its decision. *State v. Smith*, 303 Kan. 673, 679, 366 P.3d 226 (2016).

*Burghart did not have a legitimate expectation of privacy in the backpack.*

On appeal, Burghart argues that the district court erred in three ways when it denied his motion to suppress.

First, Burghart argues the district court made a factual error when it "incorrectly found, as a matter of implicit fact, that Burghart denounced ownership in that particular backpack by stating that he was not missing a backpack." According to Burghart, this conclusion is not supported by substantial competent evidence because when he denied missing his backpack he was unaware that it had been taken from Martin's property and was in possession of Sergeant Siversten. Therefore, Burghart never denied ownership in the specific backpack at issue.

The district judge found:

> "But the way the Court sees this is that I think while the [S]tate has the burden to prove that a search was lawful, a defendant has an initial burden of showing that he or she has an expectation of privacy by establishing ownership of possession of the property that's searched. And I think that's supported by case law.
> "Let's say that the van was Ms. Martin's son's. If that were the case, and he were being charged and he was here, maybe he'd have an argument that it should be suppressed. . . . [H]e might have standing to do so. But the expectation of privacy that [Martin's son] has doesn't transfer to [Burghart].

8

"[Burghart] has to show that he had an expectation of privacy in the property that was searched.

"On cross-examination, Ms. Martin said that her son told her that Mr. Burghart was buying the van from him, so theoretically he might have had an equitable interest in the property. But he was not in possession of it. It was on Ms. Martin's property.

"The bottom line to the Court is that Mr. Burghart did not have an expectation of privacy to have standing to object to the search of the van. The officer took the backpack from the van. He asked [Burghart] if he was missing a backpack.

"Again with [Burghart] having to establish—or having the burden to establish ownership, he clearly could have said no, my backpack's in this van over here, or no, I've got a backpack. But he denied missing one.

"I think that prevents [Burghart] from objecting or having standing to objecting to the search of the backpack."

The district court never made any explicit or implicit finding that Burghart did not denounce ownership of the backpack in question. Rather, the district court specifically found that Burghart did not have standing to object to the search of the van where the backpack was found and that Burghart failed to establish ownership of the backpack. Substantial competent evidence supports those findings. Martin testified that the van located on her property was her son's. Sergeant Siversten testified that he asked Burghart if he was missing a backpack and Burghart stated no and that he was just going for a walk. Burghart attempts to argue that the district court made an implicit finding that Burghart did not deny missing the exact backpack at issue. The record does not support the making of such a finding.

Burghart's second argument seeks to overcome the negative finding standard of review by arguing that the district court arbitrarily disregarded uncontroverted evidence. He claims it was arbitrary for the court to find that "Burghart disclaimed ownership on the belief that Burghart should have explicitly claimed ownership when he had no idea that Siversten possessed his backpack in the first place." This argument, again, relates to the district court's findings that Burghart had "the burden to establish ownership, he

9

clearly could have said no, my backpack's in this van over here, or no, I've got a backpack. But he denied missing one."

The standard of review for a negative finding requires a district court to have arbitrarily disregarded undisputed evidence or relied upon some extrinsic consideration such as bias, passion, or prejudice to reach its decision. *Smith*, 303 Kan. at 679. Here, the district court did not arbitrarily disregard undisputed evidence. The evidence at issue was heavily disputed throughout the suppression hearing, with the majority of Burghart's arguments centered on the fact that he never disclaimed ownership of the specific backpack at issue. The district judge's statement that Burghart "could have said no, my backpack's in this van over here, or no, I've got a backpack" is not an arbitrary disregard of undisputed evidence.

Burghart's third contention is that in addressing the issue of standing, the district court framed the wrong legal issue, arguing "the issue was not whether Burghart established ownership, because the evidence reveals that he did. At issue was whether Burghart had abandoned his personal property, the backpack." Burghart did not make this exact argument in his motion to suppress, and the State argues that this issue was not presented to the trial court and therefore should not be considered on appeal.

When the trial court has denied a motion to suppress, the moving party must object to the introduction of that evidence at the time it was offered at trial to preserve the issue for appeal. *State v. Richard*, 300 Kan. 715, 726, 333 P.3d 179 (2014).

Burghart asked for a continuing objection on the grounds specific in the motion to suppress. The district court noted the objection, considered it a contemporaneous objection, and found it preserved for appeal. The abandonment claim now presented on appeal was not specifically addressed by the motion, but Burghart's counsel made arguments related to abandonment at the suppression hearing.

10

Burghart also argues that he can raise this issue on appeal to "prevent an adverse decision against him for reasons other than those announced by the district court." See *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014).

Although this specific argument was not raised at the district court, the general, contemporaneous objection to the inclusion of evidence related to the backpack was sufficient to preserve the issue for appeal.

The Kansas Supreme Court treats the issue of whether a defendant has abandoned property as a standing issue. See *State v. Grissom*, 251 Kan. 851, 902-07, 840 P.2d 1142 (1992). Kansas courts have consistently held that an individual who abandons property is not permitted to contest the legality of the search and seizure of that property. The *Grissom* court stated:

> "'The warrantless search of an automobile which has been abandoned by its owner will violate the Fourth Amendment only if the defendant manifested a subjective expectation of privacy in the automobile and its contents that society accepts as objectively reasonable.'
>
> "'One's personal right to Fourth Amendment protection of property against search and seizure is lost when that property is abandoned, absent a manifested reasonable expectation of privacy.'
>
> "'[I]n determining the continued existence of Fourth Amendment property rights, whether the facts reveal a complete abandonment of an automobile in the strict property rights sense is not the issue. The issue is whether, by any good, sound, ordinary sense standard, the defendant abandoned any reasonable expectation to a continuation of his personal right against having his car searched.'" 251 Kan. at 903-04 (quoting *State v. Brunson*, 13 Kan. App. 2d 384, Syl. ¶¶ 3-5, 771 P.2d 938 [1989]).

A panel of our court has found that the concept of abandonment in criminal law has two components: "(1) A defendant must intend to abandon the property; and (2) the defendant must freely decide to abandon the property and the decision must not merely

11

be the product of police misconduct." *State v. Likins*, 21 Kan. App. 2d 420, 426, 903 P.2d 764 (1995). The court added:

> "'Thus, abandonment is a question of intent and exists only if property has been voluntarily discarded under circumstances indicating no further expectation of privacy.' Further, we cannot assume that a disclaimer of ownership always constitutes an abandonment for Fourth Amendment purposes. [Citations omitted.]" 21 Kan. App. 2d at 426.

In *Grissom*, the police made a warrantless entry into the defendant's vehicle and the Kansas Supreme Court held that the defendant, who parked on private property without authorization, slept in a field across the street, did not attempt to intervene when the vehicle was towed or go to the police station to claim the car, and subsequently stole another vehicle to avoid arrest, had abandoned the vehicle and did not have an objectively reasonable expectation of privacy in the seized vehicle. 251 Kan. at 905-07.

In *State v. Ralston*, 45 Kan. App. 1024, 257 P.3d 814 (2011), the defendant was a passenger in a stolen vehicle that was involved in a police pursuit. After the driver crashed the vehicle, the defendant ran from the scene without her purse. In searching the vehicle, law enforcement officers found the defendant's purse, which contained methamphetamine. On appeal, our court concluded that the defendant had abandoned her purse and lacked standing to contest the search. The *Ralston* court found that the defendant's "expectation of privacy in her purse was not objectively reasonable, and she therefore lacked standing to challenge the search." 45 Kan. App. 2d at 1029.

More recently, in *State v. Ford*, No. 119,698, 2019 WL 2147687 (Kan. App. 2019) (unpublished opinion), our court found that a defendant who placed drugs underneath a pile of gravel in the parking lot of a Sonic Drive-In abandoned the property by purposely leaving the property in a parking lot that is accessible to the public. Our court found that a

12

person who leaves drugs in a public parking lot gives up any reasonable expectation of privacy in that property—even if it wasn't abandoned. 2019 WL 2147687, at *5.

Burghart argues that he did not abandon his expectation of privacy in the backpack because he was actively trying to recover the backpack from Martin. Despite Burghart's claim that he actively tried to recover his backpack from Martin, the record supports the conclusion that Burghart did not have an objectively reasonable expectation of privacy in the backpack. Similar to *Grissom*, Burghart placed his backpack on private property without authorization, he remained in the area, did not intervene when law enforcement questioned him about missing the backpack, and denied knowing or communicating with Martin. Similar to *Ford*, it is irrelevant if the property was or was not actually abandoned if the person's expectation of privacy is objectively unreasonable.

It is not objectively reasonable for Burghart to have an expectation of privacy in property that was left on private property without authorization and which Burghart denied ownership or knowledge of. Burghart abandoned the property at the time he denied missing a backpack. Burghart freely abandoned the backpack upon questioning from law enforcement and discovering his backpack may have been picked up by the officers.

Burghart did not have a reasonable expectation of privacy in the van searched, nor did he have a reasonable expectation of privacy in the backpack. The district court did not err in denying Burghart's motion to suppress.

DID THE STATE COMMIT REVERSIBLE
ERROR DURING CLOSING ARGUMENTS?

For the first time on appeal, Burghart argues that the State accused him of lying at least nine times during closing argument. In addition, Burghart also argues that during

13

closing argument the State improperly bolstered the credibility of two of its witnesses, stated a personal opinion, improperly inflamed the passions of the jury, and misstated the law.

A claim of prosecutorial error is reviewable on appeal even absent a contemporaneous objection. *State v. Tahah*, 302 Kan. 783, 787, 358 P.3d 819 (2015).

The standard of review for a claim of prosecutorial error is a two-step process. First, "the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

Second, if error is found, "the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial." 305 Kan. at 109. To evaluate prejudice, the Kansas Supreme Court adopted the traditional constitutional harmlessness inquiry articulated by *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). *Sherman*, 305 Kan. at 109.

> "In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'" 305 Kan. at 109 (quoting *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 [2011]).

As a general rule:  "A prosecutor is . . . forbidden from accusing a defendant of lying." *State v. Fisher*, 304 Kan. 242, 253, 373 P.3d 781 (2016). However, "[P]rosecutors are permitted 'to point out inconsistencies in a defendant's statements and to argue evidence that reflects poorly on a defendant's credibility.' The comments are considered

14

in the context in which they were made, not in isolation. [Citations omitted.]" *State v. Brown*, 300 Kan. 542, 560, 331 P.3d 781 (2014).

Kansas courts have consistently held that broader rules apply during closing arguments. For example, during closing arguments a prosecutor may comment on admitted evidence as long as the remarks accurately reflect the evidence, accurately state the law, and are not intended to inflame the passions or prejudices of the jury, or divert the jury from its duty to decide the case based on evidence and the controlling law. *State v. Raskie*, 293 Kan. 906, 917, 269 P.3d 1268 (2012). Prosecutors are given "wide latitude in language and in manner or presentation of closing argument as long as the argument is consistent with the evidence." *State v. Scott*, 271 Kan. 103, 114, 21 P.3d 516 (2001). A prosecutor is "permitted to draw reasonable inferences from the evidence and is given latitude in drawing those inferences." *State v. Stano*, 284 Kan. 126, 151, 159 P.3d 931 (2007).

Additionally, although an objection is not required for appellate review, "the presence or absence of an objection may figure into our analysis of the alleged misconduct." *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009). The State emphasizes that the trial court "is required to prevent prosecutorial misconduct from occurring regardless of whether a timely objection was lodged by the defendant." *State v. Holmes*, 272 Kan. 491, 498, 33 P.3d 856 (2001). Notably here, neither Burghart's defense counsel nor the trial judge objected during the State's closing argument.

Burghart claims multiple errors, and they are addressed in the order they arose during closing argument. Burghart argues the first prosecutorial error occurred when the State was discussing Burghart's inconsistent statements to law enforcement. The State said, "He identifies himself as Mart Burkes, gives me this date of birth, which is all a lie. It isn't true." Burghart maintains that because the State said he lied, there was error.

15

While Kansas caselaw generally limits the use of the word "lie" by prosecutors, the word has not been as strictly limited during closing argument. See *State v. Anthony*, 282 Kan. 201, 210, 145 P.3d 1 (2006). The *Anthony* court held that a prosecutor's characterization of the defendant as having "lie[d] about his whereabouts" at the time of the crime was a "permissible" comment on the evidence in light of the defendant's inconsistent statements to law enforcement. 282 Kan. at 210. Similarly, in *State v. Finley*, 273 Kan. 237, 246, 42 P.3d 723 (2002), the court found it was proper for the prosecutor to comment on inconsistencies in the defendant's past statements by arguing that "the reason why people do that is because they can't keep all the lies straight." The *Finley* court recognized that the argument was based on "an inference drawn from the nature of the defendant's conflicting stories, not on the prosecutor's knowledge of the defendant's veracity." 273 Kan. at 246.

In this case, the jury heard testimony of inconsistent and untruthful identification information that Burghart gave to the officers when he was approached. Deputy Hinkle testified that Burghart gave him a false name and false birthdate when the officer stopped and questioned Burghart the morning of the break in. The State's first comment was based on evidence, not on the prosecutor's personal knowledge of Burghart's veracity. It was not error. See 273 Kan. at 246.

Next, Burghart argues that the prosecutor stated her own personal belief when "the State approached the line by implying that Burghart lied and by hinting that he is not a very good liar." The State argued:

> "The circumstantial evidence is here. Mr. Burghart doesn't even live in this area and yet he is here all day long, all day long from 5:30 in the morning till 1:30 in the afternoon. He tells officers three different reasons. I'm out jogging; I'm out visiting friends. Someone dropped me off, I'm going to The Little Grill. Could easily have said, I'm attending the Stampede. Doesn't say that."

16

According to Burghart, this comment implies that he lied and expresses a personal opinion of the prosecutor. While a prosecutor may not state his or her personal belief as the reliability or credibility of testimony given at trial, this comment was an inference drawn from the evidence and the nature of Burghart's conflicting stories, not the prosecutor's knowledge of his veracity. See 273 Kan. at 246. No error occurred here.

Directly following the State discussion of Burghart's inconsistent stories to law enforcement, the State stated, "He lies about—he lies about who he is to Deputy Hinkle. He lies about knowing Julie Martin. He lies about sending her any text messages. Why do you do that? You can use your common knowledge. Why do people lie? To get out of things; to avoid things."

Burghart argues this is error for two reasons. First, the State, again, said Burghart lied. Second, the State offered a personal opinion that Burghart lied because he was guilty. See *State v. Corbett*, 281 Kan. 294, 315, 130 P.3d 1179 (2006) ("Prosecutors must not state a personal opinion regarding the ultimate guilt or innocence of the defendant.").

These comments are based, again, on the evidence. The *Finley* court explained that while the word "lie" or its derivative should be avoided by prosecutors, a comment on motive when based on reasonable inferences from the evidence is proper. 273 Kan. at 247. As mentioned previously, this finding was in reference to the prosecutor's statement that "'the reason why people do that is because they can't keep all the lies straight.'" 273 Kan. at 246.

The statement here is similar in nature to the statement made by prosecutors in *Finley*. Both statements were made from reasonable inferences from the evidence related to the defendant's conflicting stories. As the comments are supported by the record, this was not error.

17

Burghart also argues that the State improperly bolstered the credibility of Fetters and Martin. He attacks the State's argument which states:

> "You have the right to use your common sense and your common knowledge. It is up to you as the jury to assess the credibility to determine what are the reasons that people lie. *Ms. Martin and Mr. Fetters could easily, if they were involved in this, could have hidden everything. Nobody would have known*." (Emphasis added.)

Kansas courts have consistently held that it is "improper for a prosecutor to attempt to bolster the credibility of the State's witnesses." *State v. Donaldson*, 279 Kan. 694, 708, 112 P.3d 99 (2005). The Kansas Supreme Court's analysis stated:

> "In *Donaldson*, the State improperly bolstered the testimony of a detective by stating he received no additional pay for testifying as he did and if he was making testimony up he could ruin his career and two other trials. In contrast, we have also stated it was not misconduct for the prosecution to say:
>
> "'"No police officer benefits from this investigation, no police officers benefit from concocting stories and making Mr. McReynolds agree to those stories. There's only one person in the courtroom right now who benefits from coming into this room, concocting a story and testifying under oath about that and you know who that person is."'" *State v. Sprague*, 303 Kan. 418, 428, 362 P.3d 828 (2015) (quoting *State v. McReynolds*, 288 Kan. 318, 325, 202 P.3d 658 [2009]).

The *Sprague* court added: "The latitude given to the State includes 'explaining to juries what they should look for in assessing witness credibility, especially when the defense has attacked the credibility of the State's witnesses." 303 Kan. at 428-29 (quoting *State v. McReynolds*, 288 Kan. 318, 325, 202 P.3d 658 [2009]).

Burghart argues that the State's comments are akin to those in *State v. Magallanez*, 290 Kan. 906, 914, 235 P.3d 460 (2010), a child sexual abuse case where the State said during closing arguments that "'[y]ou trust children until you have a reason not to. We

18

assume that. We assume you have taught them correctly.'" The *Magallenez* court held that this statement improperly bolstered the credibility of the State's witnesses and was outside the wide latitude granted to prosecutors in closing argument because the State "essentially gave unsworn testimony about the truthfulness of teenagers and children." 290 Kan. at 914.

In *State v. Ortega*, 300 Kan. 761, 777, 335 P.3d 93 (2014), the Kansas Supreme Court found that the State's comments during closing argument were proper because they merely probed whether the witnesses had any motivation to lie. In *Ortega*, the State was discussing the elements of disorderly conduct during closing argument and pointed to a discrepancy in the witnesses' testimony. The State reminded the jury that they are "'going to have to judge the credibility of the witnesses'" and added:

> "'The defendant obviously has a reason for shading the truth in her direction; she doesn't want to be convicted of any crimes. But remember, witnesses came in here and they testified that they saw the defendant, they knew it was her, and they knew that she said these things. What reason do they have to lie to you? Perhaps somebody who might think, well, police officers do this all the time. I don't necessarily know why you would think that, but that's the most cynical possible thing I can think of. Well, set that aside. Do middle school secretaries come into court and lie all the time? Did Ms. Perez or Ms. Delarosa, the principal, have a reason to come in here and tell you that the defendant did something or said something that she didn't really do?'" 300 Kan. at 775.

The prosecutor's comments in *Ortega* were found to be based on reasonable inferences drawn from the evidence, and the court found the prosecutor was merely explaining what the jury should look for in assessing the credibility of the school officials. Thus, the statements were within the wide latitude afforded the State in discussing evidence. 300 Kan. at 775. Additionally, the Kansas Supreme Court has found that although it is improper for a prosecutor to offer a personal opinion as to the credibility of a witness, the prosecutor has the "'freedom . . . to craft an argument that

19

includes reasonable inferences based on the evidence and that when a case turns on which [version] of two conflicting stories is true, [to argue] certain testimony is not believable.'" *King*, 288 Kan. at 352 (quoting *State v. Davis*, 275 Kan. 107, 121, 61 P.3d 701 [2003]). The *King* court added that for a prosecutor to offer "comments during closing argument regarding the witness' motivation [or lack thereof] to be untruthful were not improper." 288 Kan. at 353.

This case is more akin to *Ortega* than *Magallanez.* In *Ortega,* the State posed probing questions as to why any of the witnesses had a motivation to lie. Here, the State took this exact approach. After providing guidance to the jury on how to determine credibility, the prosecutor made statements that merely probed whether there was any motivation for Martin and Fetters to lie. "Examining whether a witness has a motive to lie is a valid consideration in weighing credibility." *Ortega*, 300 Kan. at 777; see *McReynolds*, 288 Kan. at 326 (prosecutor's explanations to the jury about what it should look for in assessing credibility is not outside the wide latitude afforded to the State). This comment by the State was not error.

The same analysis applies to the next claim of error. The State argued:

"Law-enforcement did not come knocking on [Martin's and Fetters'] door and say, hey, do you know anything about the burglary next-door. They called law-enforcement. Mr. Fetters told you, I didn't talk to the police because I thought I had a warrant.

"This is 18 months later, a year-and-a-half later. He could have told us anything he wanted to. He told you, I had a—I think I had a warrant, so I didn't want to talk to the police. I told Julie you need to call the police, and she did.

"Think about why people would be untruthful. In this case, Ms. Martin, Mr. Fetters didn't have anything to hide. They called law-enforcement."

20

Burghart argues that the statement was a personal opinion on the truthfulness of Fetters' testimony because it suggested Fetters did not fabricate any testimony and that he only told the truth. Burghart argues that "the State effectively said that he did not lie because, in its view, he made the tough choice not to lie." Burghart then argues that the State was telling the jury that both witnesses had nothing to hide, rather than allowing the jury to decide for itself. Further, Burghart suggests that "the State cannot know whether Martin or Fetters had anything to hide based on the evidence presented in this case. It is merely the State's opinion that they had nothing to hide, an improper bolstering of its witnesses."

These comments are not error when viewed in context. A prosecutor has the freedom to craft a closing argument that includes reasonable inferences based on the evidence, and it is not improper to argue certain testimony is not believable "'when a case turns on which [version] of two conflicting stores is true.'" *King*, 288 Kan. at 352. When viewed in context of the entire argument, the State's comments were not an improper attempt to bolster the credibility of Martin or Fetters. Rather, they were made in reference to the evidence and in an attempt to rebut Burghart's defense at trial that Martin and Fetters were somehow involved in the crime. No error occurred in these statements.

Burghart makes two more claims of error based on the State saying he lied. The State argued, "The defendant on the other hand, lied about who he was, changed his story about why he was in the area. Doesn't live here, and was here all day long. I'm not missing a backpack, yet that backpack held everything that belonged to him." This, again, was rooted in evidence and was not error. See *Anthony*, 282 Kan. at 210 (finding that the word "lie" was permissible in light of the defendant's inconsistent statements to law enforcement).

During the State's rebuttal, it stated that:

"To believe that Randy Fetters and Julie Martin are involved or that they burglarized the Woodman residence and the framed [Burghart], you have to accept the following: You have to accept that they are the smartest and luckiest people in the whole wide world.

". . . *You have to accept that* [*Martin and Fetters*] *knew* [*Burghart*] *would lie about knowing Julie Martin, that he would lie about texting her*." (Emphasis added.)

These statements were a comment on motive made from reasonable inferences from the evidence and was supported by the record. See *Finley*, 273 Kan. at 247 (finding a comment on motive when based on reasonable inferences from the evidence is proper).

Burghart claims the State attempted to inflame the jury. Additional facts are necessary for analysis of this claimed error. On the evening before the burglary, Julia Jilek, another neighbor of the Woodmans, was out walking her dog when she saw a suspicious person in her neighborhood. A couple weeks later, after an email notified Jilek's neighborhood of someone digging around in unlocked cars, Jilek contacted law enforcement. Jilek told law enforcement about the suspicious person she previously ran into. Sometime later, a sheriff showed her a six-person photo lineup that included Burghart. Jilek positively identified a person in the lineup as being the suspicious individual, but this person was not Burghart.

During the State's rebuttal, the State addressed Jilek's positive identification of a different man and said:

". . . Ms. Jilek, you know, she talks to police 20 days after the incident. She is identifying somebody from 20 days ago that she thinks she knows was the day before, based on an e-mail regarding vehicle burglaries. And then, a couple days later, something about maybe some residences.

22

"There's a big different between someone—I mean, she didn't even—I even asked oh, so you were talking about vehicle burglaries. No, no, just somebody opening car doors, unlocked doors, and taking loose change.

"*There's a huge difference between someone who takes a crime of opportunity to open a car door to see if there's loose change, and someone who brazenly walks into somebody's home at 4:00 in the morning and stays even knowing that somebody's awake. They stayed there*. Wasn't until Ms. Woodman came out of her office and called her husband's name, that that individual took off running." (Emphasis added.)

Burghart argues that this comment inappropriately attempted to elicit sympathy for the victims and "either inflamed the jury's passions, by stating that the burglary of a home is more heinous than entering an unlocked car, or the comment diverted the jury from its duty to decide the case based on the evidence, or both."

A State's argument cannot be "'intended to inflame the passions or prejudices of the jury or to divert the jury from its duty to decide the case based on the evidence and the controlling law.' [Citations omitted.]" *State v. Longoria*, 301 Kan. 489, 524, 343 P.3d 1128 (2015). Jurors must decide a case on evidence and controlling law and cannot decide a case based on sympathy, emotion, or prejudice. A prosecutor, therefore, "has a duty to refrain from making improper, leading, inflammatory, or irrelevant statements to the jury and 'must guard against appeals to jurors' sympathies or prejudices. [Citations omitted.]'" *State v. Holt*, 300 Kan. 985, 992, 336 P.3d 312 (2014).

When viewed in isolation, the State's comment could suggest that burglary is a more heinous crime or was an attempt to divert the jury form its duty to decide the case based on the evidence. However, the context of the challenged statement matters. See *Brown*, 300 Kan. at 560 (appellate courts consider the prosecutor's statement in the context in which they were made rather than in isolation). In context, the State's comment was an attempt to mitigate Jilek's identification of another person and was, again, based on the evidence. A prosecutor has the freedom to craft a closing argument that includes

23

reasonable inferences based on the evidence, and it is not improper to argue certain testimony is not believable "when a case turns on which [version] of two conflicting stores is true." *King*, 288 Kan. at 352.

Burghart's argument that the comment inflamed the passions of the jury is not persuasive. Nor is the argument that the comment diverted the jury. Additionally there is no error in the statement because it drew a reasonable inference from the evidence presented at trial. The evidence supports the entirety of the statement at issue and it is a reasonable inference from the evidence for the prosecutor to detail the difference between the crime committed and the crimes that Jilek described. No error occurred in this statement.

Burghart's next claim of prosecutorial misconduct occurred near the end of the State's rebuttal when the State discussed circumstantial evidence. The State stated:

> "Circumstantial evidence, he lies to law enforcement about who he is. He lies as to why he's around that area. He lies about saying I didn't lose a backpack. My passport's at home. But all of that stuff is found in his backpack, which was found on the Martin property.
> "There is sufficient circumstantial evidence that we have proven our case beyond a reasonable doubt, and we ask you to come back with a guilty verdict on both offenses."

Burghart argues the State misstated the law. When a misstatement of controlling law is made deliberately, it is outside the considerable latitude given to prosecutors during their arguments. *State v. Gunby*, 282 Kan. 39, 63, 144 P.3d 647 (2006); see *Tahah*, 302 Kan. at 791 (prosecutor's statement that, in effect, asserted the defendant could not rely on inconsistent defenses was a misstatement of the law and impermissible).

Burghart argues that the State misstated the law when it referred to the "lies" as circumstantial evidence. Burghart adds that "the State told the jury that Burghart's 'lies'

were evidence, not based on the actual evidence (no one testified that Burghart lied), but based on the State's personal opinion that Burghart's inconsistent statements to officers were lies."

Again, the use of the word "lie" was a reasonable inference from the evidence. However, the State's reference to the "lies" as circumstantial evidence could be a misstatement of law. Burghart maintains that no one ever testified he lied and while this may be true, it was a reasonable inference from the evidence for the State to say he lied with respect to the statements Burghart told law enforcement.

Circumstantial evidence supports the factual finding that Burghart lied to law enforcement multiple times. Viewed in context, the prosecutor was speaking about the evidence, direct or circumstantial, that supports the State's conclusion. Nevertheless, precedent requires that the misstatement of controlling law be deliberate in order to be error. See *Gunby*, 282 Kan. at 63. When viewed in context, the comment seems more like a poorly crafted attempt to make reasonable inferences from the evidence, rather than a statement of law suggesting the jury could rely on the "lies" as circumstantial evidence.

In all events, Burghart was not prejudiced by this statement. The jury heard all the evidence related to the "lies," regardless of whether any testimony elicited specifically stated Burghart lied. The jury was aware that Burghart gave law enforcement false identification, said he did not know Martin, denied texting Martin, said he was not missing a backpack, and told law enforcement his passport was at home. Evidence was presented through the form of testimony or exhibits that spoke to the lack of truth of each of these statements made by Burghart.

Affirmed.

25