No. 84,814

STATE OF KANSAS, *Appellee*, v. FRANCIS PATRICK DOYLE, *Appellant*.

(38 P.3d 650)

1158

Opinion filed January 25, 2002.

*Janine Cox*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*W. Scott Toth*, assistant district attorney, argued the cause, and *Steven J. Obermeier*, assistant district attorney, *Paul J. Morrison*, district attorney, and *Carla J. Stovall*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Defendant Francis Doyle appeals from convictions of first-degree murder, attempted second-degree murder, and aggravated burglary, claiming (1) there was insufficient evidence to support the jury's finding of premeditation; (2) the prosecutor's closing argument violated the defendant's due process right to a fair trial; (3) the trial judge's failure to dismiss a prospective juror for cause was reversible error; and (4) the trial judge committed reversible error in admitting a 911 dispatch tape recording into evidence.

Doyle was a newspaper carrier for the Kansas City Star from 1975 to 1985, when he retired. Doyle had been an involved father and, after his wife was diagnosed with Alzheimer's disease in 1977, he became the sole caretaker of his disabled wife until she entered a nursing home during the later stages of the disease. Subsequent to the death of his wife, Doyle began to exhibit subtle personality changes. Doyle was 79 years old at the time of the crimes.

One of the victims, Marguerite Bacher, had been married to Walter Bacher for 53 years and, for the last 35 years of their marriage, the Bachers lived on High Drive in Leawood, Kansas. Like Doyle, Walter worked as a newspaper carrier for the Kansas City Star. Walter died in 1995 after 40 years with the Kansas City Star.

After Walter's death, Marguerite and Doyle became acquainted. Marguerite introduced Doyle to her nephew, Fred Cloud. Doyle helped Marguerite around the house. She gave him a key to the house so he could care for her dog and do other chores when she traveled.

In the fall of 1998, Marguerite returned to her high school in Caldwell, Kansas, for a class reunion. At that time, she became reacquainted with her high school boyfriend, Lawrence Kubik. He proposed, and they were married shortly thereafter.

Marguerite's marriage to Kubik changed the relationship between Doyle and Marguerite. Kubik took over the odd jobs, like yardwork, that Doyle had performed prior to the marriage. Doyle began stalking Marguerite. This concerned Marguerite, but her nephew told her to let it go.

On the night of February 3, 1998, Doyle, who had the key to Marguerite's house, removed his personalized license plate from the front of his car and drove to Marguerite's house. Around 10 p.m., Marguerite's neighbor, Norma Brooks, saw Doyle driving his car very slowly past Marguerite's house. She thought it was unusual, but she was not concerned.

In the early morning hours of February 4, 1998, a 911 dispatcher received a call from Marguerite's address. The caller was a woman who asked that help be sent immediately. The dispatcher was unable to get any further information from the woman, who was clearly in distress. The dispatcher sent a call out to officers in the area.

Officers Randy Rausch, Todd Chappell, Greg Turney, and Paul Sullivan responded to the call. Rausch approached the one area of the dark house that had a light, the master bedroom. Rausch observed an individual swinging a baseball bat up and down in a chopping motion. Rausch shouted to alert the other officers to the attack. He called dispatch and requested an ambulance.

When the officers entered the house, they found there were two victims, Marguerite and Kubik. Kubik was in the bed and Marguerite was partly in the bedroom and partly in the bathroom. They then discovered Doyle crouched behind a table with a baseball bat in his hand. Doyle identified himself to the officers.

After securing Doyle, the officers checked the victims' conditions. Kubik never spoke or moved. Marguerite was nonresponsive to questions from the officers. It was clear that both victims had suffered extensive trauma.

Doyle was arrested and interviewed. During the taped interview, Doyle discussed his friendship with Marguerite and her subsequent marriage to Kubik. Doyle said that he had received a telephone call from Marguerite at about 12:05 a.m. on February 4, 1998. Marguerite said she was having some trouble with Kubik and asked Doyle to come to the house. When he arrived, he had used his key to enter the house because there was no response when he rang the doorbell. He called out, but there was no answer. He went into the bedroom and found Kubik on the floor at the foot of the bed and Marguerite in the bathroom. Doyle described the scene as very bloody. He said he leaned over Kubik, who tried to fight him off. Doyle explained that was how he ended up with blood on his clothes. Doyle said Kubik eventually asked Doyle to "go get him." Doyle said he did not go over to Marguerite. Rather, he picked up a baseball bat and started into the living room in search of the perpetrator. At that time, he heard the breaking glass and the voices of the officers. Doyle stated he hid behind the cabinet because he knew he was "in a mess" with the baseball bat in his hand. Doyle stated to the officers that he had nothing to do with Kubik's and Marguerite's conditions. Kubik did not survive. Marguerite survived, although she had sustained considerable trauma.

Kubik was 77 years old at the time of his death. An autopsy revealed 16 lacerations to Kubik's head. Inside the skull, there was extensive bleeding, both inside and outside the dura. Over the surface of the brain, there were nine separate subarachnoid hemorrhages. There were 10 areas of injury to the tissues of the brain. On the vertex of Kubik's skull, there were six lacerations, each the result of a different blow. On his forehead, there were two lateral lacerations, and on his left eye, there was a third. His nasal bridge and left cheek bone were fractured. His left ear had been torn off and sewn back on by the plastic surgeon at the hospital before Kubik died. The hemorrhaging and contusions were caused by blunt trauma or the forcible striking of the head, resulting in at least four skull fractures.

Kubik had suffered separate blows to the torso. One blow appeared to be high in the underarm area where there was a contusion. There was another contusion a little lower. There were

fractures to the right third and fourth ribs and six to seven abrasions and contusions around the right elbow, right forearm, right hand, and left elbow, and two abrasions to the left forearm and left hand. There was a fracture of the small bone in the left hand. These may have been defensive wounds. The cause of Kubik's death was blunt force injuries to the head, thorax, abdomen, and extremities. Of these, the blows to the head were most significant.

As a result of the attack, Marguerite underwent surgery on her right hand where four fingers had been broken; her left hand, where three fingers had been broken; and her left kneecap, which was also broken. Marguerite suffered skull fractures and was hospitalized for almost 6 months. She suffered memory loss of the attack, loss of the ability to walk, and she no longer has short-term memory. At the time of trial, she was still undergoing rehabilitation therapy to learn to walk, use the telephone, swallow, and to understand counting and the alphabet. She resided in a nursing home.

Doyle was charged with the first-degree premeditated murder of Kubik, attempted first-degree murder of Marguerite, and aggravated burglary. He was convicted of first-degree premeditated murder, attempted second-degree murder, and aggravated burglary. He was sentenced to life without the possibility of parole for 25 years on the murder conviction, 49 months, to run consecutively, on the attempted second-degree murder conviction, and 32 months, to run concurrently, on the aggravated burglary conviction. Doyle appealed, raising four issues.

## Evidence of Premeditation

At trial, Doyle's defense was that he was not capable of forming criminal intent or premeditation because he had senile dementia or Alzheimer's disease. When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Jasper*, 269 Kan. 649, 655, 8 P.3d 708 (2000). Both the defense and the prosecutor agreed that Doyle suffered from some level of dementia—the issue was the degree of the disease

and how the disease affected Doyle's ability to form intent or premeditation.

Premeditation is a " 'state of mind' relating to a person's reasons and motives for acting as he or she did." *State v. Cravatt,* 267 Kan. 314, 328, 979 P.2d 679 (1999). Unless a person actually communicates his or her reasons for taking another's life, evidence of premeditation must be proved by circumstantial evidence. Such evidence, however, is sufficient to establish even the gravest offenses, as in this case. Premeditation cannot be inferred from the use of a deadly weapon alone, but it may be inferred where other circumstances also exist. 267 Kan. at 328-29; see *State v. Hill,* 233 Kan. 648, 652, 664 P.2d 840 (1983).

The experts in this case used different tests and criteria in making their determinations. The defense presented expert testimony of Dr. William O'Connor, a clinical psychologist who had interviewed and tested Doyle. O'Connor testified that the mental degeneration impaired Doyle's ability to think abstractly and to reason verbally. O'Connor testified that Doyle had the normal ability to retain memories that he had known over a lifetime, but had an extremely low ability to grasp the present and retain information of the present. He testified that Doyle's ability to "think through a new problem, prospectively . . . is grossly impaired." O'Connor concluded Doyle was impaired and suffered from dementia and did not have the ability to premeditate a plan.

The prosecutor rebutted O'Connor's testimony with the testimony of Dr. Patrick Hughes, a psychiatrist who examined Doyle for the State. It was Dr. Hughes' opinion that Doyle's senile illness did not approach the level of mental impairment needed to preclude an ability to form criminal intent or to premeditate.

In addition to the expert testimony, there was circumstantial evidence from which the jury could infer premeditation: the number of blows to the victims, Doyle's removal of his license plate from his car prior to driving to Marguerite's house, the absence of evidence of provocation, and Doyle's fabricated statements to the police officers to avoid responsibility for the crime.

Doyle requests we reweigh the expert testimony and find in favor of the defense. In reviewing the sufficiency of the evidence,

this court will not reweigh the evidence. It is the jury's function, not ours, to weigh the evidence and determine the credibility of witnesses. *State v. Aikins,* 261 Kan. 346, 391-92, 932 P.2d 408 (1997).

Viewing the evidence in a light most favorable to the prosecution, we find there was sufficient evidence for a rational factfinder to have found that Doyle was able and did premeditate the commission of the crimes.

### Prosecutor's Closing Argument

During closing argument, the prosecutor stated:

"Premeditation, as the Court instructed you, means to have thought about it beforehand. *It does not mean that it had to be thought out beforehand two hours or one hour or a half an hour before the incident occurred. Something can be premeditated as soon as it happens.*

"I would suggest to you that at some point in time, even if you don't believe Mr. Doyle went over to the residence with the intent to murder those people, at such time, when he took this bat and starting hitting them, and hitting them, over and over and over again, at some point he thought about what he was doing, he knew what he was doing, and that any future blows that he would deliver were intended to kill those individuals.

"That is all that 'premeditation' means. It can be formed at any point in time. We believe, of course that we have showed you very ample evidence that there was premeditation in this case.

. . . .

"Certainly, even if he hadn't formed the intent to kill them at the time that he arrived at the residence, which wouldn't make any sense, but even if that were the case, when he went into that house and he began striking and chopping at these people, he had thought about it. And for each successive blow, he knows, 'I'm going to kill them.' " (Emphasis added.)

During jury deliberation, the jury sent a question to the court asking: "Is there a specific amount of time before a crime is committed that 'premeditated' is applied?" The court answered with a written "No" to the question.

Doyle acknowledges that he did not object at trial to the prosecutor's remarks in closing argument. He contends, however, that the prosecutor's remarks rose to the level of misconduct which resulted in a fundamentally unfair trial.

If a claimed error implicates a defendant's right to a fair trial, the appellate standard of review is the same regardless of whether the issue of prosecutorial misconduct is preserved by an objection at trial. If the claimed error rises to the level of a denial of the Fourteenth Amendment right to due process, the issue of prosecutorial misconduct will be addressed. The analysis of the effect of a prosecutor's allegedly improper remarks in closing argument is a two-step process. First, an appellate court determines whether the remarks were outside the considerable latitude the prosecutor is allowed in discussing the evidence. In criminal trials, the prosecution is given wide latitude in language and in manner or presentation of closing argument as long as the remarks are consistent with the evidence adduced. Second, an appellate court must determine whether the remarks constitute plain error; that is, whether they are so gross and flagrant as to prejudice the jury against the accused and deny a fair trial, requiring reversal. *State v. Pabst*, 268 Kan. 501, Syl. ¶¶ 2,3, 996 P.2d 321 (2000).

Doyle relies on *State v. Moncla*, 262 Kan. 58, 70, 936 P.2d 727 (1997), for support. In *Moncla*, this court disapproved a jury instruction on premeditation that included a phrase stating premeditation "may arise in an instant." However, the error in the instruction was not reversible error in that case because the evidence showed that the victim was struck in the head 18 times with a hammer and struck while a pillow was placed over her head. There was no evidence of provocation. Moncla left the murder scene before the victim was discovered, telling people he was going to work. Instead, Moncla went into hiding. Based on those facts, the *Moncla* court concluded that although the instruction was inappropriate, the record contained abundant evidence of premeditation and deliberation and the jury was not misled by the instruction. 262 Kan. at 73.

In *State v. Jamison*, 269 Kan. 564, 7 P.3d 1204 (2000), two witnesses identified the defendant as the shooter. Forensic evidence established that the bullets that killed the victims were shot from a gun identified as belonging to the defendant. The defendant was apprehended while journeying out of the state in a manner which suggested that he was attempting to flee. There was evidence of

gang involvement, providing motive evidence as well as identity evidence. 269 Kan. at 571.

The jury was instructed in accordance with PIK Crim. 3d 56.04(b) that "premeditation means to have thought over the matter beforehand." 269 Kan. at 572. The jury was also instructed that " '[p]remeditation' does not require a specific time frame." 269 Kan. at 572.

On appeal, Jamison argued that the prosecutor's final argument, which included the statement that premeditation can occur in an instant, confused the jury regarding the law and rendered its verdict without evidentiary support.

The *Jamison* court noted the jury was instructed that statements and arguments of counsel are not evidence. The jury was also advised of the definition it must apply in deciding whether there had been premeditation. Under those facts, the prosecutor's misstatement of the law on premeditation was not reversible error.

In *State v. Holmes*, 272 Kan. 491, 33 P.3d 856 (2001), this court recognized that the prosecutor's misstatement of the law can rise to the level of denying the defendant a fair trial. In *Holmes*, the victim was shot and killed in a struggle over a gun. Holmes was convicted of premeditated murder. There was no evidence of premeditation before the struggle began.

The prosecutor stated in closing argument that "premeditation can occur in an instant. That's the law in the State of Kansas." 272 Kan. at 497. That the prosecutor's statement was a deliberate misstatement of the law was evidenced by the prosecutor's statements to the trial judge during the jury instructions conference that such a statement in the court's instructions to the jury would be error. Under the *Holmes* facts, the prosecutor's deliberate misstatement of the law regarding premeditation was found to be reversible error.

Here, there is no indication that the prosecutor purposefully misstated the law. Furthermore, there is evidence of premeditation: Doyle went to Marguerite's house late at night with the keys to her house in his pocket; Doyle had removed his personalized license plate from his car prior to going to Marguerite's house; Doyle backed his car into Marguerite's driveway in such a way as

to avoid detection; Doyle told the police that he had not committed the crime but had interrupted an intruder who had committed the crime; and there is no evidence that the attack was provoked.

The jury instruction in this case was a correct statement of the law on premeditation. The facts clearly support a finding that the murder of Kubik was premeditated. In addition, the record does not clearly indicate what the jury was asking. We note that Doyle was convicted of the premeditated murder of Kubik and the attempted second-degree murder of Marguerite. Thus, the jury's question about premeditation must have concerned the attempted first-degree premeditated murder charge for the crime against Marguerite and not the crime against Kubik. Therefore, any error by the prosecution regarding premeditation was harmless.

### Failure to Dismiss a Prospective Juror for Cause

A juror may be challenged for cause when the juror's state of mind with reference to the case or any of the parties to the case is such that the court determines there is doubt that the juror can act impartially and without prejudice to the substantial rights of any party. A trial judge's ruling on a challenge for cause will not be disturbed unless it is clearly erroneous or an abuse of discretion is shown. *State v. Heath*, 264 Kan. 557, Syl. ¶ 16, 957 P.2d 449 (1998).

Doyle contends that the trial judge committed reversible error in failing to strike for cause one prospective juror whom defense counsel passed for cause.

During voir dire, the following exchange took place between Mr. Anderson, the defense counsel, and the panel:

"[Mr. Anderson:] Are there any persons on the panel that believe that—the best way to describe it would be, 'Where there is smoke there must be fire,' in other words, somebody has been charged so she or he must somehow be guilty of something? Are there any persons that believe that?

"MR. NUNNICK: Yes, sir.

. . . .

"MR. ANDERSON: Would you please tell me a little about that.

"MR. NUNNICK: I believe the defendant was caught red-handed, from what I read, you know. He was in the residence.

"THE COURT: Wait just a moment. I don't think that is responsive to the question. Do you remember me earlier talking about being circumspect if you express an opinion about what you've read?

"MR. NUNNICK: Okay.

"THE COURT: Are you saying that you've formed that opinion and it is going to affect your ability to keep an open mind?

"MR. NUNNICK: Not necessarily, Your Honor. What I know is what I've read in the paper, you know, like everybody has probably read on this case.

"THE COURT: I think that that is really the basis of the question, what you read in the paper is not fact.

"MR. NUNNICK: Well—

"THE COURT: I'm not going to get into a debate about it. I'm simply saying that is what he is asking, if you can deal with the facts, not the opinions or the statements in the paper.

"I think at least you were aiming towards that area.

"MR. ANDERSON: That was kind of what I was hoping to get, but I think that I got something different than that. That is a pretty strong statement. He has indicated, I think, a fairly strong belief at this point in time.

"Do you believe, simply, Mr. Doyle is guilty based upon what you read?

"MR. NUNNICK: No, not at all.

"MR. ANDERSON: I asked if you thought that—who might think, 'Where there is smoke there is fire,' and you raised your hand, and I asked you to tell me about that. Can you expound a little more?

"MR. NUNNICK: I don't know exactly how to put this. You said, Do I have a preconceived notion? Just from what I've read in the media. However, the way that you stated it, you said, I can't remember the term that you used, 'But if it walks like a duck, talks like a duck . . . .'

"MR. ANDERSON: 'Where there is smoke there is fire'?

"MR. NUNNICK: Right.

"MR. ANDERSON: Yeah.

"MR. NUNNICK: From what—I don't want to say this again, but from what I've read, I don't want to put too much credence on that, but it seems to me that there is so much in the paper, intimate details that, I don't have a preconceived notion, but it is in the back of my head. I'm trying to be honest—

"MR. ANDERSON: Yes, sir.

"MR. NUNNICK:—and it couldn't possibly be to where I could hold up the proceeding by my beliefs, but I—

"MR. ANDERSON: I appreciate your honesty.

"MR. NUNNICK: That's just it. I don't want to make it sound like I believe that the man is guilty or not, but, you know, you do have kind of a preconceived notion after reading some of the press coverage."

The defense attorney challenged prospective juror Nunnick for cause, and the trial court refused to strike the juror for cause. The

defense attorney then struck the juror with a peremptory strike. On appeal, Doyle argues that the trial court had a duty to insure a fair panel regardless of whether he could use one of his peremptory challenges to remove Mr. Nunnick from the panel, and the failure to do so was an abuse of discretion.

The failure to excuse a juror for cause does not constitute a ground for reversal unless the defendant was prejudiced thereby. Peremptory challenges are means to achieve the end of an impartial jury, and so long as the jury that ultimately sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not violate the Sixth Amendment. *Heath*, 264 Kan. 557, Syl. ¶ 17. Doyle does not cite any actual prejudice resulting from the failure to excuse the juror for cause. This issue is without merit.

### Admitting Evidence

The admission of evidence lies within the sound discretion of the trial court. An appellate court's standard of review regarding a trial court's admission of evidence, subject to exclusionary rules, is abuse of discretion. Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. One who asserts that the court abused its discretion bears the burden of showing such abuse of discretion. *State v. Lumley*, 266 Kan. 939, 950, 976 P.2d 486 (1999).

Over the objections of defense counsel, the prosecution was allowed to play the tape of the 911 call from Marguerite to the dispatcher. The defense counsel asserted that the tape added nothing to the evidence and was highly prejudicial. The State argued that the tape provided evidence of premeditation. The court overruled the objection and played the tape for the jury.

We have reviewed the 911 tape. The tape records a hysterical woman's voice requesting immediate help, without any explanation of why she needs help. It contains no evidence of premeditation. Furthermore, Doyle did not deny committing the alleged acts; his

defense went to his mental capacity to form criminal intent and premeditation.

However, the admission of the tape was not error. The probative value of the evidence on the tape was not highly prejudicial, and the defendant was aware that evidence would be offered. See K.S.A. 60-445. The evidence against Doyle was overwhelming. The jury did not accept Doyle's mental defect defense.

Affirmed.

DAVIS, J., not participating.

BRAZIL, Chief Judge Retired, assigned.