IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 120,310

STATE OF KANSAS,
*Appellee*,

v.

PHILLIP JERMAINE STANLEY,
*Appellant*.

SYLLABUS BY THE COURT

1.

When the facts demonstrate a criminal defendant could have formed premeditation after an initial confrontation, but before the final blow, a premeditation instruction may explain that premeditation does not have to be present before a fight, quarrel, or struggle begins.

2.

Premeditated first-degree murder and intentional second-degree murder are not identical, and the identical offense sentencing doctrine does not apply.

3.

Premeditated first-degree murder as defined in K.S.A. 2019 Supp. 21-5402(a)(1) is not unconstitutionally vague.

4.

Premeditation is not a culpable mental state. The only culpable mental state for premeditated first-degree murder is "intentional."

5.

Premeditation is a factual element concerning the conditions under which the culpable mental state of intent was formed.

6.

Premeditation is a cognitive process that occurs at a moment temporally distinct from the subsequent act.

7.

When giving an instruction clarifying the temporal aspect of premeditation, the court must also instruct the jury with this language: Premeditation requires more than mere impulse, aim, purpose, or objective. It requires a period, however brief, of thoughtful, conscious reflection and pondering—done before the final act of killing—that is sufficient to allow the actor to change his or her mind and abandon his or her previous impulsive intentions.

Appeal from Johnson District Court; THOMAS KELLY RYAN, judge. Opinion filed December 23, 2020. Affirmed.

*Michelle A. Davis*, of Kansas Appellate Defender Office, was on the brief for appellant.

*Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

STEGALL, J.: Phillip Jermaine Stanley directly appeals his first-degree murder conviction. Stanley alleges the district court erred when it refused to grant a mistrial after a witness claimed to have "double memories" and gave premeditation jury instructions. Further, Stanley argues recent developments in the law concerning premeditation have

2

erased the distinction between intentional and premeditated killings, rendering the term "premeditation" unconstitutionally vague. Finally, Stanley argues cumulative error denied him a fair trial. Finding no error, we affirm Stanley's conviction.

FACTS AND PROCEDURAL BACKGROUND

Rose Gates drove her adult son, Phillip Stanley, to a doctor's appointment on July 18, 2017. Some time after returning to Rose's duplex in Overland Park, Rose confronted Stanley about some jewelry and a watch allegedly stolen from Rose's son, Rakeim. Rose's husband, Henry Gates Jr., accused Stanley of entering Rakeim's room and taking the watch. Henry was very angry and "was just gunning to confront" Stanley, despite Rose's pleas she be allowed to discuss the watch with Stanley alone because Stanley "was hyped" and this "was not normal behavior." Although this confrontation was brief, Henry's interjection into the conversation greatly upset Stanley. Eventually, everyone calmed down, and Stanley retreated to his room.

Several hours later, Rose found the front door open. She believed Stanley went outside to smoke, but could not find him. Rose called several people attempting to locate Stanley but was unsuccessful. Rose eventually gave up and returned to bed after locking the front door.

Stanley called Rose at 1:05 a.m. and Rose told Stanley he could return to the house. But Rose changed her mind and called back about 10 minutes later to tell Stanley he should stay in a hotel. An unknown person answered and told Rose that Stanley had already been dropped off at home. At that point, Rose let Stanley in, he became angry, and he started "screaming all kinds of crazy stuff." Rose told Stanley to find a hotel and asked him to leave multiple times. Stanley blamed Henry. Afraid for her safety, Rose ran upstairs and called the police. Stanley also went upstairs to his room.

3

Shortly after making the call Rose headed downstairs, at which point Stanley followed her down the stairs asking who she had called. Rose informed Stanley she had called the police. Visibly upset, Stanley told Rose that she and Henry were "going down for this" and fidgeted with his waistband. Stanley looked out the window, quickly ran upstairs, and Rose heard gunshots. Rose fled to a neighbor's garage, where she called police a second time.

Police responded to the duplex several minutes later and two officers arrived at approximately 1:22 a.m. and 1:27 a.m. The first officer "heard numerous ban[g]ing sounds" when he pulled up. As the second officer pulled into the driveway, Stanley emerged through the main front door, but stayed behind the glass door. The officers instructed him to approach the police vehicles. Stanley was unarmed and told the officers they should handcuff him, and he placed his hands behind his back. He said the banging noises came from him beating on the inside door and told police he and Rose fought over him missing curfew.

While Stanley stood on the front porch, he tried several times to block the officers from approaching the duplex and said no one was inside. The officers eventually made it to the front porch and received an updated dispatch describing Rose's second call to police claiming Stanley had shot Henry. One of the officers handcuffed Stanley and the other entered the duplex.

Police found Henry's body upstairs with several gunshot wounds, surrounded by shell casings. Officers attempted to render medical aid, unsuccessfully. Dispatch then notified them Rose was attempting to reenter the residence. An officer met Rose at the back door of her home.

A black CZ75 9mm semiautomatic pistol was discovered on the downstairs living room couch. The handle was wrapped in blue tape, the slide was locked back, and a

4

magazine was in the gun. Testing determined all 16 bullets recovered from Henry's gunshot wounds came from the pistol and the majority of DNA recovered from the grip was consistent with Stanley.

A jury convicted Stanley of first-degree murder and Stanley received a hard 50 sentence. Stanley directly appeals.

D<small>ISCUSSION</small>

On appeal, Stanley alleges the errors described above, and we discuss each in turn.

*Stanley failed to preserve his claim that Rose's "double memories" constituted a fundamental trial failure.*

Rose stopped several times during her direct examination and explained she remembered two independent versions of the same events as a side effect of strong medication she took for her medical issues. First, Rose recounted the events as described earlier. Then, she described the "double memory" version of the same events in which she remembered falling asleep in her bed upstairs or in a recliner downstairs after Stanley left. In the "double memory," two men woke Rose up and led her upstairs. A third man stood at the front door, and a fourth came down the stairs. Rose could not describe the four men and she said she was in a "drug haze." On cross-examination, Rose agreed "the only double memory [she] had [was] about the four men."

Stanley's attorney moved for a mistrial, claiming Rose's "double memories" rendered her incompetent and unavailable:

> "Based on the testimony of this witness and the fact that she is not able to recall and has different memories and can't—it appears we're getting closer and closer to not being able to answer any questions about what happened. *I don't know that she is a*

5

*competent witness. I don't know that she is here. I think that if she doesn't have any*
*memory because of the medication and she has double memories of that night, that she is*
*not someone who—that is available to testify.*" (Emphasis added.)

The district court denied Stanley's motion, permitted cross-examination on the topic, and told each party they would have an opportunity to brief the issues of Rose's availability and competency. The district court specifically noted Stanley's objection: "We're talking about whether or not a witness is competent to testify." The next morning, Stanley's attorney declined to provide further briefing.

Stanley now makes a new argument for the first time on appeal, claiming the intentional sequencing of the State's witnesses—putting Rose's testimony at the end—denied Stanley the ability to use her testimony while cross-examining the State's other witnesses, and that this constituted a fundamental failure in the trial. It is on this ground he now asserts the district court abused its discretion when it denied his mistrial motion (abandoning the claim made to the district court that Rose was not a competent witness). This lack of preservation is fatal to his claim.

While we recognize Stanley's objection was timely, it was not on the specific ground he argues. While it came in the context of a motion for mistrial, the underlying objection at the district court was to the admission of evidence. Stanley never articulated to the district court how the timing of Rose's testimony created a fundamental failure of the proceeding. If he had, and if the district court had agreed that the State had unfairly concealed Rose's "double memory," there may have been opportunity for other curative steps short of a mistrial. But we will never know because the objection was not lodged. We generally will not consider such claims for the first time on appeal, and Stanley's claim here does not fit any of our articulated exceptions to the general rule. See *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014).

6

*The district court did not err when it included additional language in the premeditation jury instruction.*

Next, Stanley argues the district court erroneously modified the general Pattern Instructions for Kansas (PIK) defining premeditation. See PIK Crim. 4th 54.150. Our task when examining jury instructions is well known and often stated:

> "When analyzing jury instruction issues, we follow a three-step process: '(1) determining whether the appellate court can or should review the issue, *i.e.*, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, *i.e.*, whether the error can be deemed harmless.' [Citation omitted.]" *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018).

First, Stanley properly preserved this issue by objecting to the State's request of adding language to the standard PIK instruction on premeditation. Because Stanley preserved this issue, any error is reversible only if this court determines that there is a reasonable probability that the error affected the outcome of the trial in light of the entire record. See *State v. Barrett*, 309 Kan. 1029, 1037, 442 P.3d 492 (2019). Determining whether the district court erred in giving the instruction requires us to consider whether the instructions were legally and factually appropriate, using an unlimited standard of review of the entire record. *McLinn*, 307 Kan. at 318. In doing so, we view the evidence in the light most favorable to the party requesting the instruction. *State v. Barlett*, 308 Kan. 78, 84, 418 P.3d 1253 (2018).

Stanley argues that the modified PIK instruction given to the jury was legally and factually inappropriate, focusing his attention on the latter. Under PIK Crim. 4th 54.150, juries are instructed:

> "Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no

specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life."

At the instructions conference, the State requested that the court add language to the PIK instruction to assist the jury in understanding premeditation. The State requested that the court use language defining premeditation previously approved of by this court in *State v. Bernhardt*, 304 Kan. 460, 372 P.3d 1161 (2016). See *State v. Wright*, 307 Kan. 449, 455, 459, 410 P.3d 893 (2018) (affirming the use of instruction language used in *Bernhardt* describing circumstances that give rise to an inference of premeditation). Ultimately, the district court included some, but not all, of the *Bernhardt* instruction. Jury instruction No. 12 included the first and third paragraphs of the *Bernhardt* language verbatim (emphasized below):

"Premeditation

"Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life.

"*Premeditation does not have to be present before a fight, quarrel, or struggle begins. Premeditation is the time of reflection or deliberation. Premeditation does not necessarily mean that an act is planned, contrived or schemed beforehand.*

"*Premeditation can occur during the middle of a violent quarrel, struggle or fight.*" (Emphasis added.)

Stanley now claims these premeditation instructions were legally and factually inappropriate. In *Bernhardt*, the State charged Bernhardt with premeditated first-degree murder for the death of his girlfriend. Bernhardt and his girlfriend were drinking at a bar and began arguing about whether they should go home. The fight continued after the

8

couple got into their car and started driving home. During the fight Bernhardt's girlfriend allegedly reached over and smacked him. Bernhardt pulled the car over, pulled his girlfriend out of the car, and beat her on the side of the road. Bernhardt then put her in the backseat and began to drive. Soon after he started driving, however, Bernhardt pulled over again and moved his girlfriend to the trunk. After driving to his destination, Bernhardt left his girlfriend on the side of the road while she was allegedly still breathing. Bernhardt's girlfriend was found dead where he left her on the road, and an autopsy report later determined she died as a result of the beating.

At trial both Bernhardt and the State asked the court to add additional instructions to PIK Crim. 4th 54.150. Ultimately, the court's instructions included PIK Crim. 4th 54.150 and the other instructions requested:

> "'Premeditation does not have to be present before a fight, quarrel, or struggle begins. Premeditation is the time of reflection or deliberation. Premeditation does not necessarily mean that an act is planned, contrived, or schemed beforehand.

> "'Premeditation can be inferred from other circumstances including: (1) the nature of the weapon used, (2) the lack of provocation, (3) the defendant's conduct before and after the killing, (4) threats and declarations of the defendant before and during the occurrence, or (5) dealing of lethal blows after the deceased was felled and rendered helpless.

> "'Premeditation can occur during the middle of a violent episode, struggle, or fight.'

> . . . .

> "'Premeditation is the process of thinking about a proposed killing before engaging in homicidal conduct.'" 304 Kan. at 464-65.

9

Bernhardt appealed, arguing the premeditation instructions were legally inappropriate because they improperly focused on how quickly premeditation can form. This court rejected Bernhardt's claim, holding that the instructions given were correct statements of Kansas law. 304 Kan. at 472. The *Bernhardt* court noted that premeditation cannot be formed instantaneously. 304 Kan. at 470 (citing *State v. Gunby*, 282 Kan. 39, 144 P.3d 647 [2006]). But the *Bernhardt* court found that the instructions given in Bernhardt's case "did not communicate that premeditation could be instantaneous, only that it could form during or after an initial altercation." 304 Kan. at 472. Instead, "The instruction correctly informed the jury that Bernhardt did not have to premeditate [his girlfriend's] murder before pulling her out of the car and beginning to kick her." 304 Kan. at 472.

We see no reason to depart from our analysis in *Bernhardt* here. The wording of the instructions here were legally appropriate for the same reason—the instructions did not communicate that premeditation could be instantaneous. The instructions merely clarified that the intent could form *during* an altercation. The added fact that the portion of the *Bernhardt* instruction describing circumstances from which premeditation can be inferred was not given here does not change the analysis. For this reason, we find the instruction legally appropriate.

Stanley argues that even if the instructions were legally appropriate the district court erred in giving the instructions because they were not factually appropriate. Stanley distinguishes his case from *Bernhardt* based on the fact that Bernhardt told police there was a quarrel that led to physical violence. Because of this admission, the district court included the added language to help the jury determine whether Bernhardt formed premeditation after the altercation began.

Stanley argues the same rationale does not apply here because Stanley denied fighting with Henry before the shooting. When determining whether an instruction is

factually appropriate we view the evidence in the light most favorable to the party requesting the instruction. *Barlett*, 308 Kan. at 84. Here, the requesting party is the State.

According to the State's evidence, the argument between Stanley, Rose, and Henry first began when Henry accused Stanley of stealing Rakeim's watch. So here, Stanley's jury received the additional language for the same reason given in *Bernhardt*—a delay after an initial fight, but before the homicide, that could lead to juror confusion. The State summarized the need for this clarification and noted the presence of a quarrel which escalated to verbal threats. The State contended that even after Rose called the police, the argument may have gone on for some time. To avoid potential confusion, the State wanted the language to "provide guidance that even in the middle of everything that's going on shortly before the first 911 call and before the second one, or when the police show up and the shots are heard, that premeditation can get formed somewhere in between."

Just as in *Bernhardt*, the jury instruction here was both a correct statement of the law and factually appropriate given the potential for juror confusion over the temporal intricacies embedded in the legal concept of premeditation. That is, the evidence presented in this case "demonstrate[d]" that Stanley "could have formed premeditation after an initial confrontation, but before the final blow." See *State v. Stafford*, 312 Kan. ___, Syl. ¶ 1 (No. 120,481, this day decided). The district court did not err.

*Premeditated first-degree murder is not an identical offense to intentional second-degree murder, and the statute is not unconstitutionally vague.*

Next, Stanley raises a bundle of related arguments that boil down to this: Because there is no longer a practical distinction between "intentional" and "premeditated" killing, the offenses are identical. And if they are not identical, then the definition of

11

premeditation is so vague and uncertain as to render the premeditated first-degree murder statute unconstitutional. We will tackle these claims together.

Textually, the statutes differ only in that K.S.A. 2019 Supp. 21-5402(a)(1) includes the phrase "and with premeditation." This alone has been sufficient in prior cases to dismiss the kind of argument Stanley makes with relative ease. For example, in *State v. Warledo*, 286 Kan. 927, Syl. ¶ 9, 190 P.3d 937 (2008), we unequivocally held "[p]remeditated first-degree murder and intentional second-degree murder are not identical and the identical offense sentencing doctrine does not apply." Our analysis was succinct:

> "Comparing premeditated first-degree murder and intentional second-degree murder leads to the conclusion these crimes are clearly not identical. Premeditated first-degree murder is defined under K.S.A. 21-3401(a) as 'the killing of a human being committed . . . [i]ntentionally and with premeditation.' The difference between premeditated first-degree murder and intentional second-degree murder is that premeditated first-degree murder includes the element of premeditation. K.S.A. 21-3401(a); K.S.A. 21-3402(a). We also note that second-degree intentional murder is a lesser included offense of premeditated first-degree murder because all the elements of second-degree murder are identical to some of the elements of first-degree murder. K.S.A. 21-3107(2)(b)." 286 Kan. at 951.

We then consistently followed *Warledo*. See, e.g., *State v. Astorga*, 295 Kan. 339, 355, 284 P.3d 279 (2012) ("As the State points out, we rejected this same argument in . . . *Warledo*."); *State v. Hernandez*, 292 Kan. 598, 607-08, 257 P.3d 767 (2011) ("In *Warledo*, this court considered the argument that premeditated first-degree murder and intentional second-degree murder run afoul of the identical offense sentencing doctrine because there is no appreciable difference between 'premeditation' and 'intentional.' This court concluded that the two 'crimes are clearly not identical.'"); *State v. Salas*, 289 Kan. 245, 251, 210 P.3d 635 (2009) ("[W]e reject Salas' argument that premeditated first-

12

degree murder and intentional second-degree murder are substantially similar as to the necessary elements and are arguably indistinguishable on that basis.").

Similarly, we have regularly held that the notion of premeditation is not unconstitutionally vague. In *State v. Groschang*, 272 Kan. 652, 668, 36 P.3d 231 (2001), we considered a void-for-vagueness challenge to K.S.A. 21-3401(a) and its accompanying jury instruction, which read "'[p]remeditation means to have thought over the matter beforehand for any length of time sufficient to form an intent to act.'" Groschang alleged the statute and instruction together "blur[red] the distinction between premeditated murder and second-degree intentional murder to the point where there can never be an intentional killing that is not a premeditated killing." 272 Kan. at 669-70.

We quickly swept aside Groschang's challenge:

"Did the statement in Instruction No. 7 that '[p]remeditation means to have thought over the matter beforehand for any length of time sufficient to form an intent to act' make K.S.A. 21-3401(a) constitutionally vague under the facts herein? No. Groschang told Thompson it was necessary to kill [the victim]. Groschang then left the house armed with a weapon intending to kill [the victim]. It took the defendant at least 45 minutes to drive to the fairgrounds. He climbed over a fence, opened the car door and fired five shots into the head of the sleeping victim. The jury found Groschang had the necessary mental capacity to form criminal intent to kill the victim. There is no evidence of second-degree intentional murder. The only evidence is that Groschang committed premeditated murder." 272 Kan. at 670.

Several years later, we decided *State v. Martis*, 277 Kan. 267, 83 P.3d 1216 (2004). Again, at issue was the pre-recodification first-degree murder statute, K.S.A. 2002 Supp. 21-3402(a), and its accompanying jury instruction. Our review noted *Groschang*, as well as *State v. Hebert*, 277 Kan. 61, 82 P.3d 470 (2004), and *State v.*

13

*Jamison*, 269 Kan. 564, 7 P.3d 1204 (2000). *Martis*, 277 Kan. at 300-02. We held the first-degree premeditated murder statute was not unconstitutionally vague:

> "The definition of premeditation in *Jamison*, as well as in this case, adequately conveys the concept of premeditation: 'To have thought the matter over beforehand means to form a design or intent to kill before the act.' This distinguishes the crime of premeditated first-degree murder from second-degree intentional murder. . . .
>
> "As in *Groschang*, clear evidence of premeditation was presented in this case: The defendant had previously threatened to kill Wilson and Moore; he had a loaded gun; he watched Wilson and Moore drive past several times; he walked across the street to the victim's car; and he told Wilson, 'Bitch, what'd I tell you?' before opening fire on her and the other occupants. According to some of the witnesses, the defendant's gun jammed or he paused, he started to leave, then he looked into the back seat and fired several more shots. [Citation omitted.]" 277 Kan. at 302.

See *State v. Brown*, 280 Kan. 898, 899-900, 127 P.3d 257 (2006); *Vontress v. State*, 299 Kan. 607, 618, 325 P.3d 1114 (2014) (discussing *Brown*); *State v. Lawrence*, 281 Kan. 1081, 1090, 135 P.3d 1211 (2006) ("This court has approved the PIK definition of premeditation in a series of cases.").

But Stanley argues that recent decisions by this court call this existing body of caselaw into question, and significantly undermine it. We take his claims seriously, as they are colorable. Indeed, as courts have struggled to assist juries in understanding precisely how the concept of premeditation works in the context of an actual killing, we are aware that as juries receive clarifying instructions on premeditation, there is potential for a new confusion to emerge—i.e., what is the difference, if any, between premeditation and intent? It is to that question that we turn.

The difficulty can be seen by taking a closer look at our decisions in *McLinn* and *Bernhardt*. In *McLinn*, we were asked to decide the proper culpable mental state for the

crime of premeditated murder. 307 Kan. at 319. McLinn claimed the premeditation element was a required culpable mental state of the crime—in addition to the culpable mental state of intentional—which could be negated by a mental disease or defect under K.S.A. 2013 Supp. 21-5209. We engaged in a lengthy consideration of the character of premeditation under our statutory scheme and held that premeditation is not a culpable mental state, and that the only culpable mental state for premeditated first degree murder remains "intentional." 307 Kan. at 321-22.

On the way to this holding, we clarified exactly what premeditation is. Rather than being a culpable mental state, it is instead a factual element that relates to the conditions under which the culpable mental state of intent was formed. So, premeditation is "more properly understood as a temporal consideration . . . . [O]ur premeditation inquiry asks *when* the intent to kill was formed." 307 Kan. at 321. We explained:

> "McLinn counters by pointing to . . . where this court asserted premeditation 'means something more than the instantaneous, intentional act of taking another's life.' This 'something more' does not refer to a heightened culpable mental state other than 'intentionally,' however. Instead, the 'something more' means that intent cannot be formed in the instant of the act.

> ". . . [P]remeditation cannot be separated from an intent to kill—premeditation involves forming the intent beforehand. [Citations omitted.]" *McLinn*, 307 Kan. at 321-22.

In *Bernhardt*, as discussed above, we approved a jury instruction clarifying the temporal aspects of the concept of premeditation. We held that it was a correct statement of Kansas law to tell a jury that

> "'Premeditation does not have to be present before a fight, quarrel, or struggle begins. Premeditation is the time of reflection or deliberation. Premeditation does not necessarily mean that an act is planned, contrived, or schemed beforehand.

15

"'Premeditation can be inferred from other circumstances including: (1) the nature of the weapon used, (2) the lack of provocation, (3) the defendant's conduct before and after the killing, (4) threats and declarations of the defendant before and during the occurrence, or (5) dealing of lethal blows after the deceased was felled and rendered helpless.

"'Premeditation can occur during the middle of a violent episode, struggle, or fight.'" *Bernhardt*, 304 Kan. at 464.

We have subsequently upheld a premeditation instruction whenever it was factually appropriate because the facts of the case are such that the jury may be confused about when a criminal defendant could legally form premeditation sufficient for a first-degree murder conviction. This potential arises "[w]hen the facts demonstrate a criminal defendant could have formed premeditation after an initial confrontation, but before the final blow." *Stafford*, 312 Kan. ___, Syl. ¶ 1. Such an instruction "may explain that premeditation does not have to be present before a fight, quarrel, or struggle begins." 312 Kan. ___, Syl. ¶ 1.

We emphasize that we do not disturb or alter the holdings of *McLinn* or *Bernhardt* today. But we do recognize that achieving clarity concerning the temporal character of premeditation came at the potential cost of a new confusion—a blurring of the distinction between premeditation and intent. Indeed, our colleagues warned of this danger. In *Bernhardt*, Justice Lee Johnson dissented, writing:

"'I continue to reject the notion that a person can premeditate a murder while committing the murder. In my view, concurrent premeditation is an oxymoronic concept that obliterates the distinguishing feature of first-degree premeditated murder. See *State v. Appleby*, 289 Kan. 1017, 1074-75, 221 P.3d 525 (2009) (Johnson, J., concurring in part and dissenting in part).'" *Bernhardt*, 304 Kan. at 483 (Johnson, J., dissenting).

16

Justice Johnson suggested the majority holding meant that "premeditation [is] possible up to a nanosecond before [the] killing." *Bernhardt*, 304 Kan. at 486 (Johnson, J., dissenting).

And in *McLinn*, Justice Carol Beier dissented in part on the ground that she did not believe the majority sufficiently acknowledged that "premeditation differs qualitatively as well as quantitatively from intent." *McLinn*, 307 Kan. at 361 (Beier, J., dissenting). In other words, that what distinguished premeditation from intent was *more* than mere timing. We agree and take the opportunity here to explain.

We have often stated "criminal intent is the intent to do what the law prohibits." *State v. Murrin*, 309 Kan. 385, 395, 435 P.3d 1126 (2019); *State v. Mountjoy*, 257 Kan. 163, 170, 891 P.2d 376 (1995). Our criminal code says that a person "acts 'intentionally,' or 'with intent,' with respect to the nature of such person's conduct or to a result of such person's conduct when it is such person's conscious objective or desire to engage in the conduct or cause the result." K.S.A. 2019 Supp. 21-5202(h). Under Kansas law, "intentionally" is the highest possible culpable mental state and requires "'one person's "conscious objective" to be to cause a result, or to engage in conduct.'" *State v. Thach*, 305 Kan. 72, 83, 378 P.3d 522 (2016); see *State v. Dinkel*, 311 Kan. 553, 560, 465 P.3d 166 (2020). Put simply, conduct is intentional when it is "'purposeful and willful and not accidental.'" *State v. Baacke*, 261 Kan. 422, 435, 932 P.2d 396 (1997).

This comports with widely accepted definitions. Intent is "[t]he state of mind accompanying an act, esp[ecially] a forbidden act. . . . [I]ntent is the mental resolution or determination to do it." Black's Law Dictionary 964 (11th ed. 2019); see also American Heritage Dictionary 912 (5th ed. 2016) (defining intent as "[s]omething that is intended; an aim or purpose"). Similarly, someone acts intentionally when an action is "[d]one with the aim of carrying out the act." Black's Law Dictionary 965 (11th ed. 2019); American Heritage Dictionary 913 (5th ed. 2016) ("Done deliberately; intended:  an intentional

17

slight. . . . Having to do with intention."). So, intent adheres in the mental condition of purpose, aim, and objective—that is, something determined, not chanced or indifferent.

Our caselaw likewise defines premeditation. On the surface, premeditation appears quite similar to intent, as it is the "'"state of mind" relating to a person's reasons and motives for acting as he or she did.'" *State v. Doyle*, 272 Kan. 1157, 1162, 38 P.3d 650 (2002). We have explained that "'premeditation is the *process* of thinking about a proposed killing before engaging in the homicidal conduct,'" and "'is the time of reflection or deliberation.'" (Emphasis added.) *Gunby*, 282 Kan. at 64. We have fleshed out this concept in numerous decisions. See *State v. Brownlee*, 302 Kan. 491, 515, 354 P.3d 525 (2015); *Warledo*, 286 Kan. at 949 ("[P]remeditation is 'the process of thinking about a proposed killing before engaging in the homicidal conduct,' but premeditation 'does not have to be present before a fight, quarrel, or struggle begins.' Further, premeditation is 'the time of reflection or deliberation. Premeditation does not necessarily mean that an act is planned, contrived, or schemed beforehand.'"); *State v. Jones*, 279 Kan. 395, 402, 109 P.3d 1158 (2005) ("We begin by observing that premeditation is the process of thinking about a proposed killing before engaging in the homicidal conduct. . . . Consequently, it means something more than the instantaneous, intentional act of taking another's life."); *Doyle*, 272 Kan. at 1162; *State v. Scott*, 271 Kan. 103, 108, 21 P.3d 516 (2001) ("Premeditation is the process of thinking about a proposed killing before engaging in the homicidal conduct.").

Again, common usage can assist our inquiry. See Black's Law Dictionary 1429 (11th ed. 2019) (Premeditation is the "[c]onscious consideration and planning that precedes an act [such as committing a crime]; the pondering of an action before carrying it out."); Black's Law Dictionary Appendix A, Legal Maxims p. 2012 (11th ed. 2019) ("*Scelus intra se tacitum qui cogitat facti crimen habet*. He who secretly meditates a crime is guilty of the deed.").

18

The 10th Circuit Court of Appeals explained the difference between one who acts intentionally and one who acts intentionally and with premeditation:

> "An ordinary person could discern a difference between a killing that is committed intentionally and a killing that is committed intentionally and with premeditation, if premeditation involves thinking a matter over beforehand and intentionally involves purposeful, willful and non-accidental conduct. Thinking something 'over' indicates a quantum of reflection—premeditation—absent from the deliberative process necessary to act intentionally—'to act purposefully, willfully and not by accident.'" *Sperry v. McKune*, 445 F.3d 1268, 1272 (10th Cir. 2006).

Premeditation, then, adheres in the conditions present when intent was formed. If intent is the mental condition of purpose, aim, and objective, then premeditation exists when that mental condition arises before the act takes place and is accompanied by reflection, some form of cognitive review (i.e., "thinking over"), deliberation, conscious pondering. That is, premeditation is a cognitive process which occurs at a moment temporally distinct from the subsequent act.

Realistically then, how does an intentional act differ from a premeditated one? To put this in the ordinary language of experience, we all regularly act intentionally but without cognitive reflection, review, deliberation, or pondering. I see a freshly baked chocolate chip cookie and I eat it. There is a fair chance I ate it intentionally—that is, I possessed the requisite mental condition of purpose, aim, and objective—but without premeditation. In ordinary language, it might be said that I ate the cookie "without a second thought." This doesn't mean I ate it on accident. It means I did not engage in a cognitive moment of reflection or pondering. It was an "impulse" decision. This kind of internal, snap decision making has been described as instantaneous and even "unconscious." See Laran, Journal of Marketing Research, Vol. 53, No. 3, *Exploring the Differences Between Conscious and Unconscious Goal Pursuit*, 442, 444 (2016) ("[T]he

unconscious, unlike the conscious, cannot allocate resources to more precisely assess the expected efficacy of an alternative with respect to a goal.").

Alternatively, perhaps I saw the cookie, decided to eat it, and as I reached for it, an internal, cognitive brake was engaged that essentially asks—"Is eating the cookie really what you want to do before dinner?" My thought processes have now entered a phase of conscious deliberation. See Vol. 53, No. 3, *Exploring the Differences Between Conscious and Unconscious Goal Pursuit*, at 443 (Explaining conscious decision making "makes it possible to improve the accuracy of a choice with respect to the goal [e.g., healthy food]" and this cognitive process can "identify the attributes that are likely to satisfy the goal" and "assess the degree to which the attribute level of any one alternative will satisfy the goal. . . . Subsequently, consciousness can use elaboration to screen, organize, prioritize, and coordinate this information when making a choice.").

At this point, I can override that cognitive brake and eat the cookie anyway; or, I may alter my intended behavior once the process of "reflection" and "thinking over" has played itself out. The temporal space required to complete that process may be very short—a mere hesitation, perhaps, as my hand hovers over the cookie and I complete the internal double-check. We all are familiar with that cognitive sensation, and we all have likely learned to recognize it in others when we see it—to discern the "hesitation" that goes along with "having a second thought." This is premeditation.

Premeditated murder is a more serious crime with a more serious penalty precisely because society and law have recognized for centuries that overriding an internal cognitive brake—that is, choosing the intended act after reflection—is a factual element that makes the crime factually worse. When a person is given the opportunity to turn back and abandon an intended course of action but declines to do so, society attaches a higher degree of responsibility to the consequences of that act. "Premeditated or planned criminal activity is generally treated more harshly in law than unplanned or impulsive

20

activity. A deterrent rationale generally motivates the distinction—if an action is premeditated or planned, it can be deterred." Farahany, *Law and Behavioral Morality*, 52 Nomos, 115, 126 (2012). So a person "who not only aims at evil, but takes time and consideration to achieve this evil, appears particularly culpable." Ferzan, *Plotting Premeditation's Demise*, 75, No. 2, Law and Contemporary Problems 83, 95 (2012).

In other words, what distinguishes premeditation from intent is *both* a temporal element (time) *and* a cognitive element (consideration). It is "thought" that happens "beforehand." We trust everyone—including every juror—will instinctively understand this experience. But, that does not mean that they do not need it explained clearly to them in the context of the law of premeditation. Indeed, we acknowledge that these fine distinctions could be lost on juries deliberating on the differences between intentional and premeditated acts. Therefore, the best practice in future cases using a *Bernhardt* instruction is to add the following:  Premeditation requires more than mere impulse, aim, purpose, or objective. It requires a period, however brief, of thoughtful, conscious reflection and pondering—done before the final act of killing—that is sufficient to allow the actor to change his or her mind and abandon his or her previous impulsive intentions.

With this extended explanation, we affirm our precedent holding that premeditated first-degree murder and intentional second-degree murder are not identical offenses, and K.S.A. 2019 Supp. 21-5402(a)(1) is not unconstitutionally vague.

*Cumulative error did not deny Stanley a fair trial.*

Finally, Stanley asserts cumulative error denied him a fair trial. Finding no error on appeal, the cumulative error doctrine does not apply. *State v. Marshall*, 303 Kan. 438, 451, 362 P.3d 587 (2015).

Affirmed.

21

BEIER, J., not participating.

MICHAEL E. WARD, Senior Judge, assigned.[1]

* * *

LUCKERT, C.J., concurring:  I concur because I would hold the confusing and contradictory premeditation instruction could have misled the jury. But the confusion caused by the instruction would not have affected the outcome of Phillip Stanley's trial that includes overwhelming evidence of premeditation, and I agree with the rest of the majority's reasoning affirming the verdict.

Stanley's jury applied a premeditation instruction that uses portions of the premeditation instruction in *State v. Stafford*, 312 Kan. ___ (No. 120,481, this day decided), and *State v. Bernhardt*, 304 Kan. 460, 372 P.3d 1161 (2016). I dissented in both those cases because the "instruction was so contradictory and misleading that a lay juror could not have clearly understood premeditation." *Bernhardt*, 304 Kan. at 489 (Luckert, J., dissenting). The result is an erroneous instruction. See *State v. Horton*, 300 Kan. 477, 491, 331 P.3d 752 (2014) (citing *State v. Appleby*, 289 Kan. 1017, 1059, 221 P.3d 525 [2009]) (jury instructions must "properly and fairly state[] the law as applied to the facts of the case and . . . not have reasonably misled the jury").

Although the instruction given in Stanley's trial did not include all the erroneous language in the instruction given in *Stafford* and *Bernhardt*, it retained one portion of the

[1]**REPORTER'S NOTE:**  Senior Judge Ward was appointed to hear case No. 120,310 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court by the retirement of Chief Justice Lawton R. Nuss.

22

confusing language. The confusion arises from two sentences in the instruction. One sentence stated: "Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act." The second sentence informed the jury: "Premeditation does not necessarily mean that an act is planned, contrived or schemed beforehand." I continue to ask how a reasonable juror not well-versed in the law of premeditation can reconcile a requirement that a defendant form a design to kill before committing the act with the statement that premeditation does not necessarily mean the act was planned, contrived, or schemed? As Justice Johnson stated in his *Bernhardt* dissent: "How does one reflect or deliberate about killing the victim without planning, contriving, or scheming to kill the victim? If the defendant was not planning, contriving, or scheming to kill the victim, he or she was not premeditating the murder." *Bernhardt*, 304 Kan. at 486 (Johnson, J., dissenting).

As I explain in my dissent in *Stafford*, there is a way to reconcile these two statements. But the instruction did not provide Stanley's jury enough information for it to understand the difference in the two sentences. See *Stafford*, 312 Kan. at __, slip op. at 5-6. Like the premeditation instruction used in *Bernhardt* and *Stafford*, this instruction reveals the danger of pulling one sentence out of a decision of this court without providing the context and explanation surrounding the sentence. The result is misleading and confusing.

For these reasons, I would hold that the premeditation instruction was erroneous.

Having reached that conclusion, I must determine whether this error required reversal. Stafford objected to the instruction, which means the error is reversible if there is a reasonable probability the error affected the outcome of the trial given the entire record. *State v. Barrett*, 309 Kan. 1029, 1037, 442 P.3d 492 (2019); see K.S.A. 2019 Supp. 22-3414(3) ("No party may assign as error the giving or failure to give an instruction . . . unless the party objects thereto before the jury retires to consider its

23

verdict . . . unless the instruction or the failure to give an instruction is clearly erroneous."). I conclude the error here was not reversible.

The evidence of Stanley shooting and killing Henry Gates Jr. after saying that Gates was "going down" and after going upstairs to find and shoot Gates provides overwhelming evidence of the formation of a design and intent to kill. Given the strong evidence supporting premeditation, there is no reasonable probability the error affected the outcome of the trial.